**LATINO OFFICERS ASSOCIATION, NEW YORK, INC., and Anthony Miranda, in his capacity as President of the Latino Officers Association, New York, Inc., on behalf of its members, Plaintiffs–Appellees,**

v.

**THE CITY OF NEW YORK, The Police Department of the City of New York, Rudolph W. Giuliani, Mayor of the City of New York, and Howard Safir, Police Commissioner of the City of New York, Defendants–Appellants.**

**Docket No. 99–7657.**

United States Court of Appeals, Second Circuit.

Argued July 13, 1999.

Decided Nov. 17, 1999.

Christopher T. Dunn, New York Civil Liberties Union, New York, N.Y. (Arthur Eisenberg and Norman Siegel, New York Civil Liberties Union, New York, NY, of counsel), for Plaintiffs–Appellees.

Stuart D. Smith, Office of the Corporation Counsel of the City of New York (Michael D. Hess, Corporation Counsel of the City of New York; and Barry P. Schwartz, Assistant Chief, Appeals Division, of counsel), for Defendants–Appellants.

(J. Michael McGuinness, Elizabethtown, NC, for amicus curiae National Troopers Coalition.)

Before: WINTER, Chief Judge, and WALKER and CABRANES, Circuit Judges.

José A. Cabranes, Circuit Judge:

The City of New York, the New York City Police Department, Mayor Rudolph W. Giuliani, and Police Commissioner Howard Safir (collectively, the "NYPD") appeal from an order of the United States District Court for the Southern District of New York (Kimba M. Wood, *Judge*), entered June 10, 1999, preliminarily enjoining the NYPD from prohibiting members of plaintiff Latino Officers Association ("LOA") from marching, in uniform and behind an LOA banner, in various parades. *See Latino Officers Ass'n v. City of New York,* No. 97 Civ. 1384(KMW), 1999 WL 386753 (S.D.N.Y. June 10, 1999) (*"LOA"*). The District Court found, *inter alia,* that plaintiffs had demonstrated a substantial likelihood of success on the merits of their claim that the NYPD policy at issue violates LOA members' rights under the First Amendment. Several days before the last of the parades in question, in an order entered October 6, 1999, we affirmed the judgment of the District Court, and indicated that we would thereafter file an opinion explaining our reasons for that disposition. We now explain those reasons.

## BACKGROUND

The LOA is a fraternal organization that seeks to promote the ideals, goals, and interests of Hispanic officers in the NYPD.[1] The organization was founded in

---

1. It bears noting that "Hispanic" and "Latino" are usually used interchangeably as near synonyms, but the usage preferred by a person or group may reflect nuanced differences of perspective. "Hispanic," derived from the Latin word for Spain, *Hispania,* is defined most simply as "relating to or derived from the people, speech, or culture of Spain ...; *often:* Latin–American ... —hispanic-american." WEBSTER'S THIRD NEW INTERNATIONAL DIC-

TIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1072 (1976). "Latino," meaning simply "Latin American," *id.* at 1276, avoids the explicit link to Spain that inheres in the word "Hispanic."

Placing weight on these subtle differences may be fraught with ironies. An eminent authority, Professor Roberto González Echevarría of Yale University, has observed that "what to call Latin America has been a vehe-

1996 by a dissident faction of the Hispanic Society, another fraternal organization of the NYPD. The LOA is headed by plaintiff Anthony Miranda, and currently has about 1500 members; in contrast, the Hispanic Society has approximately 250 members.

In February 1997, plaintiffs brought this action, under 42 U.S.C. § 1983, challenging the process by which the NYPD officially recognizes groups composed of NYPD members organized on the basis of ethnicity, religion, and sexual orientation. Such official recognition—currently accorded to 25 groups, including the Hispanic Society, see LOA, 1999 WL 386753, at *1 n. 2 (listing all 25)—allows an organization to use NYPD facilities for meetings and fundraising, to post notices on NYPD bulletin boards, to list events in the official NYPD calendar of events, and to recruit members at the Police Academy. In addition, only a recognized organization may seek permission on behalf of its members to march in a parade in uniform and behind the organization's banner. If a recognized organization is marching in a parade, any officer may march in uniform behind that organization's banner. In contrast, if an officer chooses to march behind the banner of an unrecognized group, he may not wear his NYPD uniform.

The process by which groups apply for recognition by the NYPD is now set forth in NYPD Personnel Bureau Memo 30 ("PBM 30"), which was promulgated in May 1998. According to PBM 30, "official recognition of an organization is at the sole discretion of the police commissioner." To be recognized, however, the objectives of a prospective organization "must be consistent with the goals and mission of the [NYPD] ... [and] consistent with the law." Further, PBM 30 notes that, "[i]n order to promote harmony within the Department, discourage rivalries between groups of officers and conserve the resources of the Department hierarchy in meeting with and supervising the activities of recognized organizations, the Department discourages the formation of multiple organizations which purport to serve the same goals and missions."

The LOA applied for recognition from the NYPD pursuant to PBM 30 in May 1998 and, when no response was forthcoming, again in January 1999.[2] On May 5, 1999, defendant Safir denied the LOA's application, asserting that the LOA's purposes and objectives mirrored those of the Hispanic Society, which was already recognized by the NYPD. The LOA questions whether this justification was offered in good faith, contending that the NYPD favors the Hispanic Society because it has political ties to the Mayor and because it has not been as active as the LOA in challenging NYPD discrimination against minorities.

Following the NYPD's rejection of the LOA's application for recognition, plaintiffs moved for a preliminary injunction with respect to only the parade provisions of the NYPD recognized group policy. Specifically, plaintiffs sought an order prohibiting the NYPD from preventing members of the LOA from marching in uniform and behind the LOA banner in five parades

mently debated issue, with some proposing the awkward but perhaps most accurate Iberoamérica for the entire continent, and others Hispanoamérica." Roberto González Echevarría, Preface to THE OXFORD BOOK OF LATIN AMERICAN SHORT STORIES xi, xi (Roberto González Echevarría ed., 1997). He adds: "[I]t was the French, in their imperialist zeal [in Mexico, under the Emperor Maximilian, in particular] who coined the term [Latin America]. They opposed Latin to Anglo America to claim for political gain a historical and linguistic kinship with regions recently freed from Spanish domination. The name has

stuck, although clearly many of the cultures in the region had no significant connection with the Roman Empire." Id. (emphasis added).

2. The LOA had applied previously for recognition by the NYPD in 1997 (before the promulgation of PBM 30), without success. That application was allegedly rejected pursuant to an NYPD policy in effect at the time, which prohibited recognition of more than one group per ethnic, religious, or sexual orientation group.

from June 1999 to October 1999.[3] The District Court granted the motion, finding that plaintiffs had a First Amendment interest in wearing NYPD uniforms in public parades and that the NYPD had failed to demonstrate that plaintiffs' interest was "outweighed by [the] expression's necessary impact on the actual operation of the Government." *LOA,* 1999 WL 386753, at *4 (internal quotation marks omitted).[4] This appeal followed.[5] Like the preliminary injunction, this appeal concerns only the parade provisions of the NYPD recognized group policy.

## DISCUSSION

■■■ We review a decision to grant a preliminary injunction for abuse of discretion. *See SEC v. Cavanagh,* 155 F.3d 129, 132 (2d Cir.1998). A preliminary injunction will be overturned if the district court "applie[d] legal standards incorrectly or relie[d] upon clearly erroneous findings of fact." *Id.* (internal quotation marks omitted).

■■■ Where, as here, a moving party seeks a preliminary injunction to stay " 'government action taken in the public interest pursuant to a statutory or regulatory scheme,' " that party must show irreparable harm in the absence of an injunction and a likelihood of success on the merits. *New York Magazine v. Metropolitan Transp. Auth.,* 136 F.3d 123, 127 (2d

Cir.) (quoting *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996)), *cert. denied,* —— U.S. ——, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998); *accord Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (per curiam). Violations of First Amendment rights "are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Bery v. City of New York,* 97 F.3d 689, 693 (2d Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997); *see also Deeper Life Christian Fellowship, Inc. v. Board of Educ.,* 852 F.2d 676, 679 (2d Cir.1988) (" '[The] loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976))). Accordingly, in the context of this case, whether plaintiffs have satisfied the requirements for a preliminary injunction turns on whether they have shown a likelihood of success on the merits of their claim that the NYPD parade policy violates their rights under the First Amendment. *See Beal v. Stern,* 184 F.3d 117, 123–24 (2d Cir.1999).

## I. Restrictions on Government Employee Speech

■■■ It is well established that "[i]ndividuals do not relinquish their First Amendment rights by accepting employ-

---

**3.** The specific parades are: the Puerto Rican Day Parade, held on June 13, 1999; the Dominican Day Parade, held on August 8, 1999; the Brooklyn Puerto Rican Day Parade, held on August 15, 1999; the Desfile de Hispanidad de Queens, held on September 12, 1999; and the Desfile de Hispanidad, Fifth Avenue, held on October 10, 1999.

**4.** This is not the first time plaintiffs have obtained a preliminary injunction allowing them to march in uniform and behind the LOA banner. In 1997, plaintiffs sought such a preliminary injunction with respect to the Puerto Rican Day Parade held on June 8, 1997. In an opinion dated June 6, 1997, Judge Miriam Goldman Cedarbaum granted plaintiffs' motion. *See Latino Officers Ass'n v. City of New York,* 966 F.Supp. 238 (S.D.N.Y. 1997). Two months later, in August 1997,

plaintiffs moved for a similar preliminary injunction with respect to four other parades. In an opinion dated August 19, 1997, Judge Wood granted that motion. *See Latino Officers Ass'n v. City of New York,* No. 97 Civ. 1384(KMW), 1997 WL 473972 (S.D.N.Y. Aug.19, 1997). Defendants appealed Judge Wood's decision, and, after plaintiffs' then counsel failed to appear, we stayed the preliminary injunction and eventually dismissed the appeal as moot. *See Latino Officers Ass'n v. City of New York,* No. 97–9013, 1998 WL 386178 (2d Cir.1998) (unpublished order).

**5.** On June 10, 1999, defendants applied to us for a stay of the injunction pending appeal. By order entered June 11, 1999, we denied defendants' application for a stay, but agreed to expedite the appeal.

ment with the government." *Harman v. City of New York,* 140 F.3d 111, 117 (2d Cir.1998) (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Nevertheless, the state does have "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. Accordingly, the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. National Treasury Employees Union,* 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (*"NTEU "*). In evaluating a restriction on government employees' speech, a court must seek "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731.

■■■ The District Court, relying on the Supreme Court's decision in *NTEU,* subjected defendants to a higher burden of justification than normally required of the government when the free speech interests of its employees are at stake, on the ground that the NYPD parade policy restrains speech "before it occurs." *LOA,* 1999 WL 386753, at *4. In *NTEU,* which involved a statute that prohibited federal employees from "receiv[ing] any honorari[a]," 513 U.S. at 459, 115 S.Ct. 1003, the Supreme Court drew a distinction between *ex post* punishment, based on an "analysis of one employee's speech and its impact on that employee's public responsibilities," and *ex ante* rules, which can represent a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." 513 U.S. at 466–67, 115

S.Ct. 1003; *see also id.* at 481, 115 S.Ct. 1003 (O'Connor, J., concurring in the judgment in part and dissenting in part). Emphasizing that *ex ante* restrictions on expression "give[ ] rise to far more serious concerns than could any single supervisory decision," the Court held that the government's burden of justification is "greater" with respect to such *ex ante* restrictions. *Id.* at 468, 115 S.Ct. 1003 (majority opinion). Specifically, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* (quoting *Pickering,* 391 U.S. at 571, 88 S.Ct. 1731). Further, the government "must do more than simply posit the existence of the disease sought to be cured.... It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475, 115 S.Ct. 1003 (internal quotation marks omitted).

Defendants' principal contention on appeal is that the District Court erred in applying this stricter standard from *NTEU.* The *NTEU* standard does not apply, defendants argue, because (1) the NYPD parade policy affects fewer employees (approximately 40,000 as opposed to 1.7 million) and restricts less expression (the unauthorized wearing of uniforms in parades as opposed to receiving compensation for writings or speeches on any subject) than the statute at issue in *NTEU;* (2) the parade policy, unlike the statute in *NTEU,* does not " 'single out' expressive conduct"; and (3) the parade policy is not a "classic 'prior restraint,' " but rather "suppresses precisely that conduct which [the NYPD] would be allowed to punish after the fact." [6] These arguments are without merit.

6.  Defendants argue that the degree of deference owed to the NYPD parade policy is gov-

erned, not by *NTEU,* but by *Fighting Finest, Inc. v. Bratton,* 95 F.3d 224 (2d Cir.1996). In

First, that the NYPD parade policy affects fewer employees than the policy at issue in *NTEU* and that it arguably could be characterized as narrower in scope are irrelevant to whether the *NTEU* standard applies.[7] Application of the *NTEU* standard turns on whether a government employee's expression is restricted "through a generally applicable statute or regulation, as opposed to a particularized disciplinary action," and there is no doubt that the former is involved here. *Weaver v. United States Info. Agency*, 87 F.3d 1429, 1439 (D.C.Cir.1996), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2407, 138 L.Ed.2d 174 (1997). To be sure, the *NTEU* Court cited the *"vast group* of present and future employees" and the *"broad range* of present and future expression" at stake in that case as factors weighing against the government. 513 U.S. at 468, 115 S.Ct. 1003 (emphases added). But nothing in *NTEU* implies that the stricter standard applies *only* when a "vast group" of employees is involved or when a regulation restricts a "broad range" of expression. *Cf. Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171–72 (2d Cir.1999) (applying *NTEU* in upholding an NYPD regulation restricting officers' public comments regarding police department matters); *Harman*, 140 F.3d at 118 (applying *NTEU* in striking down a regulation restricting the speech of 6500

employees in the Administration for Children's Services).[8]

Defendants' second argument—that the parade policy, in contrast to the statute at issue in *NTEU*, does not " 'single out' expressive conduct"—is similarly inapposite. *NTEU* concerned a law that banned federal employees from accepting compensation for making speeches or writing articles in their spare time. The two government commissions that recommended the ban, however, had stressed the importance of prohibiting both compensation for "appearance[s], speech[es] or article[s]" *and* compensation for "other off duty activities" such as consulting, serving on corporate boards, and even sports. 513 U.S. at 474–75, 115 S.Ct. 1003. Under these circumstances, the Supreme Court found the statute's singling out of expressive activity significant, concluding that it "undermine[d] the Government's submission that the breadth [of the statute was] reasonably necessary" to protect the government's interest in the efficiency of public service. *Id.* at 474, 115 S.Ct. 1003. That the statute in *NTEU* restricted only expressive activities was thus a *factor* the Court used in assessing the reasonableness of the restriction at issue there; it was not, as defendants appear to assert, a *prerequisite* to the Court's stricter scrutiny.

*Fighting Finest,* we applied public forum analysis to reject a claim that the First Amendment required the NYPD to allow a non-profit boxing team of NYPD members to post notices on police department bulletin boards. *See id.* at 229–31. Although police department bulletin boards may be compared to the kinds of governmental property commonly subjected to public forum analysis, we do not think that police uniforms are similarly comparable. Accordingly, we decline to apply public forum analysis to plaintiffs' claims.

7. We do not mean to suggest agreement with defendants' assertion that the restriction at issue here is narrower in scope than the restriction at issue in *NTEU*. In fact, one could argue just the opposite insofar as the NYPD parade policy prohibits certain expression altogether while the statute in *NTEU* merely imposed a "burden"—albeit a "significant"

one—on expressive activity. *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003.

8. In *Latino Officers Ass'n v. Safir*, we phrased the standard somewhat differently from the way we phrase it here and the way we phrased it in *Harman*. *See Latino Officers Ass'n v. Safir*, 170 F.3d at 171–72 (" 'Where a restraint is accomplished through a generally applicable statute or regulation ..., we must ... make sure that the regulation's sweep is reasonably necessary to protect the efficiency of the public service.' " (quoting *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474, 115 S.Ct. 1003))). Nevertheless, it is evident from our references in *Latino Officers Ass'n v. Safir*—to *NTEU* and to *Harman, Weaver*, and *Sanjour v. EPA*, 56 F.3d 85, 93–94 (D.C.Cir. 1995), all of which applied *NTEU*—that the standard we applied in that case came from *NTEU*. *See id.*

Finally, defendants contend that, in contrast to the statute in *NTEU*, the NYPD parade policy is not a "classic 'prior restraint'" because it "suppresses precisely that conduct which [the NYPD] would be allowed to punish after the fact." But this argument presumes the very conclusion that is at issue in this case—namely, that the NYPD can prohibit unrecognized groups, including the LOA, from marching in parades in uniform and behind their organization banners. The danger of a prior restraint, as opposed to *ex post* disciplinary action, is precisely that making predictions *ex ante* as to what restrictions on speech will ultimately be found permissible is hazardous and may chill protected speech. *See, e.g., NTEU*, 513 U.S. at 481, 115 S.Ct. 1003 (O'Connor, J., concurring in the judgment in part and dissenting in part) ("[*E*]x ante rules, in contrast to *ex post* punishments, carry risks of overinclusiveness and underinclusiveness."); *id.* at 468, 115 S.Ct. 1003 (majority opinion) ("[U]nlike an adverse action taken in response to actual speech, [an *ex ante* restriction] chills potential speech before it happens."); *see also New York Magazine*, 136 F.3d at 131 ("We consider prior restraints to be particularly abhorrent to the First Amendment in part because they vest in government agencies the power to determine important constitutional questions properly vested in the judiciary.").

In short, the District Court properly subjected defendants to the "greater" burden of justification set forth in *NTEU*.

## II. Applying the *NTEU* Standard

■ Having decided that the stricter *NTEU* standard applies to the NYPD parade policy, we must evaluate the District Court's conclusion that plaintiffs were likely to succeed on the merits of their First Amendment claims. Under *NTEU*, that evaluation involves a consideration of the parties' respective interests.

The District Court found that plaintiffs have a strong First Amendment interest in marching in uniform and behind their own banner. Noting "[n]umerous newspaper articles ... attest[ing] to the prominent role played by the LOA in speaking publicly about alleged discrimination in the police force," the Court concluded that "[t]he message that plaintiffs seek to convey is not merely that they are proud to be Latino and police officers ..., but that they are willing to criticize the NYPD publicly for alleged discrimination." *LOA*, 1999 WL 386753, at *4 & n. 4.

On appeal, defendants challenge these findings with three arguments. First, they contend that plaintiffs' interest in wearing police uniforms is not protected under the First Amendment at all because members of the public are unlikely to understand "that the LOA [is] concerned about discrimination and police misconduct merely from the fact that the LOA members [are] wearing uniforms." Second, defendants argue that police officers' ethnic pride is not a matter of public concern, as required for protection of government employee speech under *Pickering* and *NTEU*. Finally, defendants assert that plaintiffs' interest in wearing police uniforms while marching is weak because they could just as easily communicate their intended messages without uniforms—for example, by handing out pamphlets or by carrying a banner that reads "LOA—Police Officers Concerned About Discrimination and Police Misconduct."

In light of our view, discussed below, that defendants have an improperly selective policy concerning organizations that are permitted to wear uniforms during parades, we need determine only that the interests of plaintiffs in wearing the uniform meet minimal standards for triggering First Amendment concerns. Notwithstanding defendants' arguments to the contrary, we find that they do.

First, members of the public—specifically, the spectators at each of the parades—are more likely to discern and understand the LOA's message about discrimination and misconduct in the NYPD if plaintiffs

wear uniforms. To be sure, as defendants contend, spectators are unlikely to understand the LOA's message *merely* from the fact that its members are in uniform. However, in conducting the necessary inquiry into "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," *Texas v. Johnson,* 491 U.S. 397, 404–05, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), a court should not disregard "the context in which [that conduct] occurred." *Id.* at 405, 109 S.Ct. 2533. Here, the context of plaintiffs' conduct includes the significant publicity that the LOA has received for its positions on discrimination and misconduct in the NYPD. In view of that context, we think it is fair to infer that "the likelihood was great that [plaintiffs'] message would be understood by those who viewed it." *Id.* at 404, 109 S.Ct. 2533 (internal quotation marks omitted); *see also Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) ("[A] narrow, succinctly articulable message is not a condition of constitutional protection.").

■ Second, plaintiffs' interest in communicating ethnic pride as members of the NYPD is not necessarily a matter only of private concern. A statement is of public concern if, in light of "the content, form, and context of [that] statement, as revealed by the whole record," it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see Lewis v. Cowen,* 165 F.3d 154, 163–64 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 70, —— L.Ed.2d —— (1999). The parades in which plaintiffs seek to march, each of which garners hundreds of thousands of spectators—both in person and on television—are *themselves* about ethnic pride and celebrating ethnic participation in the civic life of New York City. As the current President of the Puerto Rican Day Parade stated before the

thirty-fourth annual parade in 1991, "the philosophy of and reason for the [Puerto Rican Day Parade] 'has been to succeed in making sure that *every* Puerto Rican feels proud of his culture.' " Marilyn Pérez-Cotto, *Roots of the Parade,* N.Y. Newsday, June 9, 1991 (Community Affairs Special Section), at 2 (emphasis added); *see also* 144 Cong. Rec. E1137, E1137 (June 16, 1998) (statement of Rep. Serrano) (referring to the Puerto Rican Day Parade as a "national event, in which thousands of individuals march along Fifth Avenue, in Manhattan, in celebration of our Puerto Rican heritage and our achievements in this nation"). Indeed, that the NYPD authorizes other groups such as the Hispanic Society to march in uniform is an acknowledgment that celebrating ethnic participation in the police force can be "fairly considered . . . of . . . concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684.

Finally, defendants' own policies make it difficult for us to accept that plaintiffs could communicate the same message—or that they could communicate their message as effectively—without wearing their police uniforms. As defendants acknowledge by allowing other groups, including the Hispanic Society, to march in uniform, wearing the official uniform of the NYPD in a public parade like the Puerto Rican Day Parade has a unique expressive quality that would be lost were plaintiffs merely to hand out fliers or to carry a banner proclaiming their message explicitly.

■ Under *NTEU,* we must affirm the judgment of the District Court unless defendants demonstrate that plaintiffs' interests and the interests of plaintiffs' potential audiences, *see NTEU,* 513 U.S. at 468, 115 S.Ct. 1003; *Sanjour,* 56 F.3d at 94, are outweighed by the expression's "necessary impact on the actual operation of the Government," *NTEU,* 513 U.S. at 468, 115 S.Ct. 1003 (internal quotation marks omitted). Before the District Court, defendants identified "two principal interests" served by the NYPD policy prohibiting an unrecognized group whose mission mirrors

that of a recognized group from marching in uniform: first, the need of the NYPD to promote the appearance and reality of harmony within its ranks; and, second, the conservation of resources of the NYPD Ceremonial Unit, which reviews and musters marching officers to ensure that they are properly attired and appropriately behaved. *LOA*, 1999 WL 386753, at *5. The District Court concluded that these interests were insufficient, however, in large part because, in its view, defendants failed to demonstrate that such interests would actually be undermined by allowing plaintiffs to march. *See id.* at *5–6.

Appropriately in our view, defendants do not seriously contest these conclusions on appeal.[9] Instead, defendants press two arguments allegedly not considered by the District Court: (1) that the NYPD has an absolute right to control the way its uniform and symbols are deployed; and (2) that spectators are likely to think that any group marching in uniform is speaking for the NYPD and that the NYPD has a right to control the content of its own expression.[10] In our view, neither argument satisfies defendants' burden of justification.

It is undisputedly true that the NYPD has a strong interest in maintaining control over how its uniform and symbols are used. Requiring NYPD officers to wear their uniforms while on duty makes them "more readily recognizable to the public, encourages *esprit de corps*, and subordinates personal preferences in favor of the overall group mission," all of which furthers the police department's mandate to promote public safety. *INS v. Federal Labor Relations Auth.*, 855 F.2d 1454, 1466 (9th Cir.1988); *cf. Kelley v. Johnson*, 425 U.S. 238, 246, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) (holding that deference is owed to police department grooming

regulations under the Fourteenth Amendment Due Process Clause based on such organizations' "overall need for discipline, esprit de corps, and uniformity"). Correspondingly, prohibiting the unauthorized wearing of a police uniform prevents improper exercise of the powers granted to police officers and exploitation of the trust that wearing a police uniform is meant to inspire.

Nevertheless, defendants' interest in controlling the use of the NYPD uniform does not support the specific restriction at issue here—namely, the prohibition on plaintiffs' marching in uniform behind their organizational banner in an ethnic pride parade when similarly situated organizations are allowed to march in such a manner. Whether or not defendants could constitutionally prohibit all fraternal organizations from marching in uniform—an issue we need not, and do not, decide—the fact of the matter is that the NYPD already permits at least 25 such organizations to march in uniform. Having allowed these organizations to use the NYPD uniform in such a manner over many decades, the NYPD cannot now deny plaintiffs the same privilege without demonstrating that their use of the uniform is both distinguishable from that of the various authorized organizations and "so threatening to the efficiency of the [NYPD] as to render the [restriction] a reasonable response to the threat." *NTEU*, 513 U.S. at 473, 115 S.Ct. 1003.

Although not directly on point, *Schacht v. United States*, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970), a case drawn to our attention by defendants, supports this conclusion. In *Schacht*, the Supreme Court reversed a conviction under 18 U.S.C. § 702, which makes it a crime for any person without authority to wear a

---

**9.** Nor do they assert that duplicativeness among groups in itself would have a necessary impact on the actual operation of the NYPD.

**10.** The parties dispute whether defendants raised these arguments before the District

Court and, if they did, whether they are now relying on evidence that was not presented to the District Court. Because we do not think that defendants' arguments warrant reversal in any event, we need not settle these disputes.

468

uniform of the United States armed forces, when a separate provision permitted one to wear a military uniform " 'in a theatrical or motion-picture production ... *if the portrayal does not tend to discredit [the] armed force[s].*' " *Schacht,* 398 U.S. at 59–60, 90 S.Ct. 1555 (quoting 10 U.S.C. § 772(f)) (emphasis in *Schacht* ). Although the Court acknowledged that § 702, "standing alone," was a "valid statute on its face," *id.* at 61, 90 S.Ct. 1555, it held that the exception for any portrayal that "does not tend to discredit [the] armed force[s]" impermissibly restricted expression on the basis of viewpoint. *See id.* at 62–63, 90 S.Ct. 1555.

Here, as in *Schacht,* defendants may be constitutionally permitted to prohibit all fraternal organizations from marching in uniform.[11] But it does not follow from this premise that defendants have the seemingly lesser included authority to ban only some organizations from marching in uniform. Under *Schacht,* and under other Supreme Court cases involving selective prohibitions on expression, defendants' selectivity must itself pass constitutional muster. *Cf. City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 425–28, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (holding that Cincinnati could not ban commercial newsracks from public property while allowing noncommercial newsracks, "even if ... the city might entirely prohibit the use of newsracks on public property"); *Carey v. Brown,* 447 U.S. 455, 465, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (invalidating a statute that prohibited residential picketing, except for labor picketing, in part because there is "nothing inherent in the nature of peaceful labor picketing that would make it any less disruptive of residential privacy than peaceful picketing on issues of broader social concern"); *Police Dep't v. Mosley,* 408 U.S. 92, 94, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (invalidating a city ordinance prohibiting picketing in front of schools, except for labor picketing, on the ground

that it "makes an impermissible distinction between labor picketing and other peaceful picketing"). Defendants' general interest in controlling the use of its uniforms and other symbols does not, by itself, suffice.

Nor are we persuaded by defendants' second argument—that the public is likely to believe that the NYPD itself is speaking and that the NYPD has a right to control its own speech. To be sure, it is well settled that the government may regulate its own expression in ways that would be unconstitutional were a private party the speaker. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("[W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message."). But, as the *Pickering* and *NTEU* line of cases makes plain, not all speech by a government agent is "government speech" subject to such lenient analysis; indeed, even when a government agent represents that he is speaking as a representative of the government body, that agent may have independent rights under the First Amendment. *See, e.g., Moore v. City of Wynnewood,* 57 F.3d 924, 933–34 (10th Cir.1995); *cf. Zook v. Brown,* 748 F.2d 1161, 1167 (7th Cir.1984) ("[T]he [Police] Department cannot maintain that it has an overriding interest in every conceivable public statement [an officer] might make, no matter what the context or content of the statement, simply because the [officer] identifies his office.").

In the present case, we decline to adopt defendants' invitation to characterize plaintiffs' expression as government speech subject to any and all regulation. Defendants raise the slippery-slope argument that if they are compelled by the First Amendment to permit the LAO to march, then they would *a fortiori* be compelled to

11. Again, we need not, and do not, decide this issue.

"allow police officers to march in uniform with any organization whatsoever, including the Ku Klux Klan or the Nazi Party." But whether or not defendants could, consistent with the First Amendment, prohibit police officers from marching in uniform with a group like the Ku Klux Klan—an issue we need not, and do not, decide today—the mere possibility that such a situation might arise does not justify prohibiting plaintiffs themselves from marching in uniform behind the LAO banner in the parades at issue here.

In short, defendants have failed to satisfy their burden of showing that plaintiffs' expression *specifically* would have an impact on the actual operation of government. In fact, by their own conduct, defendants have proved the exact opposite, for, throughout most of this dispute, defendants have justified their prohibition of the LOA marching in uniform on the sole ground that its message is duplicative of the Hispanic Society's message. The NYPD, having allowed the Hispanic Society to march in uniform and behind its banner, cannot now contend that allowing the LOA to do the same would have a detrimental effect on its actual operations.

### CONCLUSION

For the reasons stated above, we agree with the District Court that plaintiffs have demonstrated a likelihood of success on the merits of their claims that the NYPD parade policy violates their rights under the First Amendment.[12] Accordingly, the judgment of the District Court is affirmed.

---

12. In light of this conclusion, we need not address plaintiffs' alternative argument that the NYPD parade policy constitutes an impermissible licensing scheme under *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), or *amicus curiae's* argument that the policy violates the constitutional guarantee of equal protection of the laws and substantive due process.