LATINO OFFICERS ASSOCIATION, Anthony Miranda, and Hiram Monserrate Plaintiffs,

v.

Howard SAFIR, Commissioner of the New York City Police Department, et al., Defendants.

No. 97 CIV. 3143(SHS).

United States District Court, S.D. New York.

Sept. 26, 2001.

Christopher Dunn, Norman Siegel, New York Civil Liberties Union Foundation, New York, NY, for Plaintiffs.

Amy Regan, Bryan Glass, New York City Law Dept., New York, NY, for Defendants.

Findings of Fact & Conclusions of Law

STEIN, District Judge.

An organization of New York City Police Officers and its president and vice-president brought this action pursuant to 42 U.S.C. § 1983 to challenge the constitutionality of a policy of the New York City Police Department ("NYPD" or "the Department") regarding statements made at public events about the department by police officers. Specifically, plaintiffs contend that the policy impermissibly infringes their right to free speech in violation of the First and Fourteenth Amendments of the United States Constitution and Article 1, Section 8 of the New York State Constitution, and they seek declaratory and injunctive relief prohibiting the enforcement of the policy to the extent it applies to NYPD members who wish to speak in their private capacities about non-confidential matters of public concern. As originally challenged, the policy required that, with regard to any public statement to a private organization or testimony before a governmental agency,

officers: (1) must have given written notice five days in advance; (2) must have obtained the prior written approval of the Commissioner before all voluntary appearances; (3) must have submitted a report after the appearance, including a summary of the statement; and (4) were prohibited from making such statements or giving such testimony without the presence of the officer's supervisor, unless prior specific approval was given.

Plaintiffs commenced this action on May 1, 1997 by filing the complaint and simultaneously moving for a preliminary injunction prohibiting enforcement of the policy. This Court granted that motion and preliminarily enjoined the NYPD from implementing or enforcing the policy, set forth at that time in Patrol Guide 114-8. *See Latino Officers Ass'n v. Safir*, No. 97 Civ. 3143, 1997 WL 426099 (S.D.N.Y. July 30, 1997). In response, the Department modified the policy to delete the requirements that prior approval be obtained and the prohibition on appearances without the attendance of a supervisor, and appealed the grant of the preliminary injunction with respect to the remaining provisions. The United States Court of Appeals for the Second Circuit vacated the injunction with respect to the modified policy as unsupported by the record that had developed prior to the time the modification was made, although that Court noted that because the policy as initially challenged contained four provisions, plaintiffs "may not have focused on developing the record" with respect to the notice and reporting provisions alone. *See Latino Officers Ass'n v. Safir*, 170 F.3d 167, 173 (2d Cir. 1999).

This Court subsequently held a bench trial on plaintiffs' challenge to the modified policy and is issuing these findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND AND FINDINGS OF FACT

### A. The Challenged Policy

The current policy—set forth in Interim Order 52—contains both a notice provision and a reporting provision. The notice provision requires that members of the NYPD who wish to speak in their private capacities about "Department policy or positions on public matters at any public hearing or meeting before a governmental agency, court, investigating body, legislative committee, administrative agency, private organization, etc." provide five days' advance notice of their intent to do so to the Department. (Pl.Ex. 4.) The officer must also provide a "synopsis of the subject matter to be addressed," the name and address of the agency or organization, and the date and location of the testimony or statement. (*Id.*) The policy requires that officers give notice through their commanding officers up the chain of command to the Commissioner of the Department. The reporting provision requires the individual to deliver "a written summary or text of the testimony/statement, including issues discussed, and questions and answers," to the Office of the Commissioner the following day. (*Id.*)

These provisions apply only to statements made at "public" events—i.e., statements made at private hearings and meetings are exempt—and do not apply to statements made to the media. (Pl.Ex. 4; Tr. at 280–81.) Moreover, officers who are labor union representatives are excused from complying with the policy when testifying or making statements "regarding Department policy or positions on public matters." (Stipulations ¶ 12.) Any violation of patrol guide policies—including Interim Order 52—can result in discipline up

to and including termination from the NYPD. (Tr. at 268–69.)

Although Interim Order 52 or its predecessor have been in effect since at least August 28, 1987 (Pl.Ex. 1), the Department has no record of any officer complying with its provisions or suffering discipline for failure to comply prior to July 30, 1997. (Stipulations ¶¶ 1–7.)

## B.  The Effect of the Policy on Plaintiffs

The Latino Officers Association ("LOA") was formed in 1996 for the purpose of advancing the interests of the Latino members of the NYPD. (Tr. at 10–11.) Anthony Miranda and Hiram Monserrate are members of the NYPD and at the time of the hearing in this matter served as the President and Vice President, respectively, of the LOA. (*Id.* at 9–10, 142–43.)

The LOA's mission is "to represent Latino police officers in the New York City Police Department and build ties with the community, between the community and the police agency to better their relationship with the community." (Tr at 10.) Since LOA's founding, its officials have made numerous public statements criticizing the NYPD, focusing in particular on discrimination within the Department, police brutality, and discriminatory enforcement. (*Id.* at 11–13.) Fora for these statements have included legislative hearings, community meetings, law schools, and private foundations. (*Id.* at 18–19.) In addition, LOA and its members have filed several lawsuits and EEOC complaints against the NYPD alleging both discrimination and retaliation for their activities. (*Id.* at 12–13.)

Early in 1997, LOA officials began to receive warnings in the form of anonymous telephone calls that the NYPD intended to punish them for this activity. (Tr. at 14.) In at least one of these calls, the policy regarding public statements was specifically mentioned. (*Id.*)

In response to these warnings, LOA officials curtailed their public speaking. For example, Monserrate declined an invitation to speak about police-community relations and police brutality at a public event sponsored by the Anthony Baez Foundation because he did not want to notify the NYPD of the event, he did not want to report statements made at the event to the Department, and he was concerned about possible retaliation. (Tr. at 14–17, 154–56.)

Both the notice and the reporting provisions have discouraged LOA officials from speaking publicly. With respect to the notice provision, LOA officials fear that their compliance will result in fewer invitations to speak at public events, because some organizations will not want high-ranking police officials to have five days' advance notice of the location and sponsorship of the event. (Tr. at 51–55.) In addition, LOA officials fear that providing the Police Commissioner with a summary of statements critical of him or the Department will result in retaliation or suppression of their speech. (*Id.* at 48–50, 152.) In particular, Miranda expressed the fear that the Department will deny officers' request for changes in their work schedules, which also must be submitted five days in advance, if it determines that a request for a schedule change was made for the purpose of making remarks critical of the Department at a public event. (*Id.* at 48–50.)

With respect to the reporting provisions, Miranda believes that some organizations will be reluctant to invite him to speak because those organizations will not want a report of "issues discussed" and the questions their members might ask brought to the attention of high-ranking police offi-

cials. (Tr. at 60–61.) In addition, both Miranda and Monserrate fear that they might face retaliation in the form of discipline on the basis of the Department's concluding that their reports pursuant to Interim Order 52 are inaccurate or incomplete. (*Id.* at 57–59; 153.)

## C. The Department's Justification for the Policy

Testimony regarding the Department's need for Interim Order 52 was provided by Michael Collins, an NYPD Inspector and Commander of the Department's Public Information Division. (Tr. at 237.) The mission of the Public Information Division is to provide to the public clear, accurate and timely information on issues of public concern relative to the NYPD. (*Id.* at 239–40.)

Collins testified that the purpose of Interim Order 52 is to enable his division to respond quickly and accurately when asked to comment on officers' statements at public events. (Tr. at 242–43.) Collins explained that his office is often called upon for comment shortly after a statement is made, and that the notice provision affords his office an opportunity to research the topic of the speech and prepare a response. (*Id.* at 242–46.) With respect to the reporting provision, Collins stated that reports are useful in the event of follow-up stories or meetings, in that they would enable his office to respond to a "complete statement." (*Id.* at 256.)

Collins did not adequately explain, however, how Interim Order 52's exceptions for statements made to the media and statements made by union representatives are consistent with these proffered justifications. With respect to statements made to the media, Collins testified that there was no need for notice or reporting because "responsible" members of the media called his office for comment "immediately" after a statement was made. (Tr. at 261.) He did not explain, however, why the prospect of immediate calls to his office for a response justifies Interim Order 52 in the case of testimony before a governmental agency or a statement to a community group yet renders it unnecessary in the case of statements made to the media. Collins did not offer any testimony with respect to the exception for statements made by union members.

## II. CONCLUSIONS OF LAW

As an initial matter, the Court must determine the proper framework in which to analyze the constitutionality of Interim Order 52. The Department contends that, because the order is not so onerous as to amount to a *per se* prior restraint on speech, *see Morris v. Lindau,* 196 F.3d 102, 112–13 (2d Cir.1999), it is constitutional if there is a rational relationship between the order's restrictions on speech and a legitimate governmental interest. Plaintiffs contend that the Court must apply a modified version of the test first articulated in *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[1]

■ In *United States v. National Treasury Employees Union,* 513 U.S. 454, 115

---

1. The activities of the police department are manifestly matters of public concern. *See Harman v. City of New York,* 140 F.3d 111, 118 (2d Cir.1998) ("[D]iscussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern.") (internal quotations omitted).

S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("*NTEU*"), the United States Supreme Court set forth a modified *Pickering* test with which to analyze a "wholesale deterrent to a broad category of expression by a massive number of potential speakers" such as Interim Order 52. *Id.* at 467, 115 S.Ct. 1003. Specifically, a broadly sweeping policy that deters government employees' speech will survive a First Amendment challenge only if the government demonstrates "that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003 (quoting *Pickering,* 391 U.S. at 571, 88 S.Ct. 1731).

In deciding the Department's appeal from the order granting the preliminary injunction in this case, the United States Court of Appeals for the Second Circuit applied the *NTEU* test to the policy at issue here, and explicitly held that the *NTEU* balancing test "is the appropriate framework of analysis even where the regulations at issue do not purport to ban speech, but instead impose indirect burdens on speech." *Latino Officers Ass'n v. Safir,* 170 F.3d 167, 172 (1999); *see also Latino Officers Ass'n, New York, Inc. v. City of New York,* 196 F.3d 458, 463–65 (2d Cir.1999) ("LOANY"). Accordingly, the *NTEU* standard is the appropriate standard to apply to Interim Order 52 in order to determine its constitutional soundness.

■ Viewed through the prism of *NTEU,* Interim Order 52 cannot withstand scrutiny. Plaintiffs' interest in "the unfettered dissemination of their views regarding the police department" and the public's interest in their informed opinions are each strong interests. *See Latino Officers Ass'n,* 170 F.3d at 172. Plaintiffs' testimo-

ny established that the harm to these interests caused by Interim Order 52 is more than "conjectural." *Cf. id.* at 171. Indeed, the record in this action reflects the fact that the order has already resulted in plaintiffs curtailing their speech.

Although the Department's interest in staying informed of its officers' public statements is also strong, see *id.* at 172, the evidence adduced at trial casts doubt on the Department's assertion that the dangers it associates with officers' public statements are so great as to render the order a reasonable response to the threat. First, the Department's assertion that the notice provision is required to enable it to respond to questions immediately after public statements are made rings hollow in light of its simultaneous assertion that it has no need for advance notice from the media precisely because "responsible" media members contact the Department for comment "immediately." *Cf. NTEU,* 513 U.S. at 473–74, 115 S.Ct. 1003.

Second, the Department offered no evidence explaining the reason it deems the public statements of NYPD members who are union officials to be less dangerous than the public statements of other officers; the NYPD's argument that because the role of unions is codified, see Def. Ex. B1, the Department is constitutionally permitted to make distinctions between the speech of union officials and the speech of other employees is not a meaningful response. *Cf. NTEU,* 513 U.S. at 474–75, 115 S.Ct. 1003.

Third, the Departments' admission that it has no record of any effort to enforce the predecessor to Interim Order 52 for almost ten years—from August 28, 1987, to July 30, 1997—belies the notion that officers' public statements pose a serious threat to the efficiency of the NYPD. *Cf. LOANY,* 196 F.3d at 467.

To meet the heavy burden imposed by *NTEU,* the NYPD "must do more than simply 'posit the existence of the disease sought to be cured.' ... It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU,* 513 U.S. at 475, 115 S.Ct. 1003 (quoting *Turner Broad. Sys., Inc. v. Federal Communication Comm'n,* 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). It has failed to do so here.

## III. CONCLUSION

Accordingly, the Court finds that the interests of both the LOA and the public are not outweighed by the impact on the actual operation of the Government of officers' public speech, and Interim Order 52 impermissibly infringes plaintiffs' right to free speech in violation of the First and Fourteenth Amendments of the United States Constitution. Judgment shall enter in favor of plaintiffs.