PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1516
_____

LODGE NO. 5 OF THE FRATERNAL ORDER OF
POLICE,
BY JOHN MCNESBY, TRUSTEE AD LITEM;
COPPAC, BY MICHAEL LUTZ, TRUSTEE AD LITEM;
DAVID BYRNE; SHAWN CAREY; JEFFREY SEAMON;
LES BAKER,

Appellants

v.

CITY OF PHILADELPHIA;
MAYOR OF THE CITY OF PHILADELPHIA;
BOARD OF ETHICS OF THE CITY OF PHILADELPHIA;
J. SHANE CREAMER,
EXECUTIVE DIRECTOR OF THE CITY OF
PHILADELPHIA BOARD OF ETHICS;
WILLIAM H. BROWN; RICHARD GLAZER;
SANJUANITA GONZALEZ; PHYLLIS BECK;
MICHAEL H. REED, MEMBERS OF THE CITY OF
PHILADELPHIA BOARD OF ETHICS
_____

On Appeal from the United States District Court

for the Eastern District of Pennsylvania
(D.C. No. 11-cv-03256)
District Judge:  Honorable Juan R. Sanchez

———————

Argued November 12, 2013
Before:  HARDIMAN, SCIRICA
and NYGAARD , *Circuit Judges*.

(Filed: August 18, 2014)

Thomas W. Jennings [Argued]
Marc L. Gelman
Jennings Sigmond
510 Walnut Street
The Penn Mutual Towers, 16th Floor
Philadelphia, PA 19106
        *Attorneys for Plaintiffs-Appellants*

Eleanor N. Ewing [Argued]
Robert D. Aversa
Mark Maguire
City of Philadelphia
Law Department
1515 Arch Street
One Parkway
Philadelphia, PA 19102
        *Attorneys for Defendants-Appellees*

———————

OPINION

———————

HARDIMAN, *Circuit Judge*.

In 1951, the Philadelphia City Council enacted a Home Rule Charter which, informed by Philadelphia's history of political patronage, restricted certain political activities by city employees. In this appeal we must decide whether one such restriction, which prevents members of the Philadelphia Police Department from making contributions to their union's political action committee, violates the First Amendment. We hold that it does.

I

A

Appellant Lodge No. 5 of the Fraternal Order of Police (FOP) is an incorporated collective bargaining organization that represents the approximately 6,600 active police officers employed by the City of Philadelphia. FOP operates a political action committee, Appellant COPPAC, for the purpose of distributing contributions to candidates for local and state office. According to FOP's leadership, COPPAC affords police officers an opportunity to speak on issues of concern with a "collective voice," which include departmental interests in "better equipment, manpower, [and] livable conditions." A132. COPPAC funds information campaigns that educate the public about issues important to the police, and contributes to political candidates who support the department's positions on these issues. To date, COPPAC has donated to city, state, and judicial campaigns.

3

In this case, FOP, COPPAC, and four police officers (collectively, the FOP Plaintiffs)[1] challenge the constitutionality of section 10-107(3) of the Philadelphia Home Rule Charter, which prohibits employees of the Philadelphia Police Department from making contributions "for any political purpose."[2] 351 Pa. Code § 10.10-107(3). As interpreted by its implementing regulation, the Charter

[1] The individual officers are David Byrne, Shawn Carey, Jeffrey Seamon, and Les Baker. The FOP Plaintiffs sued the City of Philadelphia, Philadelphia Mayor Michael A. Nutter, the Philadelphia Board of Ethics (Ethics Board), and individual members of the Ethics Board (collectively, the City). The individual Ethics Board members are J. Shane Creamer, William H. Brown, Richard Glazer, Sanjuanita Gonzalez, Phyllis Beck, and Michael H. Reed.

The Ethics Board was established in 2006 to "administer and enforce all provisions of [the] Charter and ordinances pertaining to ethical matters," including "prohibited political activities." Phila. Home Rule Charter § 4-1100. It promulgates rules and regulations that interpret provisions of the Charter, and investigates and enforces violations of the Charter. *See* Phila. Code § 20-606(1)(a).

[2] The provision provides in full:

> No officer or member of the Philadelphia Police or of the Fire Department shall pay or give any money or valuable thing or make any subscription or contribution, whether voluntary or involuntary, for any political purpose whatever.

4

prohibits police officers from making donations "received by a candidate . . . for use in advocating or influencing the election of the candidate," or providing donations "received by a political committee, political party, or partisan political group." Bd. of Ethics Reg. No. 8, § 8.1(f); *see id.* § 8.8.[3] Accordingly, employees of the Philadelphia Police Department cannot donate to COPPAC because it uses some of its funds for partisan political purposes. Notably, the Charter ban applies only to the police, and does not proscribe political donations made by Philadelphia's other 20,000 employees, the vast majority of whom are represented by organized interests.[4]

COPPAC presently operates out of an account that contains approximately $25,000. FOP solicits funds for COPPAC by mail and hosts regular fundraisers, at which large donors receive so-called "courtesy cards" from the

---

[3] Regulation 8, which interprets section 10-107, reiterates the Charter's prohibition on political contributions by the police, providing that no "appointed officer or employee of the Police Department . . . may make contributions intended for a political purpose." Bd. of Ethics Reg. No. 8, § 8.8.

[4] Of the city's 27,000 employees, approximately 20,000 are represented by four unions: FOP, Fire Fighters Local Union No. 22, and District Councils 33 and 47 of the American Federation of State, County and Municipal Employees. Each of the three unions that represent the balance of the city's unionized employees has established political action committees that regularly contribute to candidates for political office.

union that extend "all courtesies of [the] organization" to the donor. A139. FOP also endorses candidates for local office and regularly holds fundraisers for them. The City is concerned that officers may have inadvertently violated the contribution ban during these fundraisers, but has indicated that it is willing to forego enforcement of past transgressions.[5]

The FOP Plaintiffs maintain that COPPAC's current funds cannot support the committee's operational costs or effectively advance the union's political agenda. They claim that COPPAC's relatively meager account—which has prevented the committee from purchasing expensive television advertisements and from contributing to candidates' campaigns—has placed the police at a competitive disadvantage, especially in labor negotiations where they compete with other municipal workers. As recent examples, the FOP Plaintiffs cite instances where FOP has failed to convince legislators to increase officers' pensions, to prevent an interagency reorganization that reduced the police department's workload, and to improve officers' working conditions.

---

[5] In a May 5, 2011, letter to FOP, Appellee J. Shane Creamer, the Executive Director of the Ethics Board, suggested that FOP "remind members who are current Police Department employees that they cannot make political contributions," lest they be "subject to penalties . . . which include a $300 fine and removal from office or immediate dismissal." A98. Creamer indicated that the Ethics Board would not enforce violations if donors wrote to the candidate, with a copy to Creamer, requesting reimbursement of their contributions. The Ethics Board intends to enforce future violations of the Charter ban, however.

6

The contribution ban prevents COPPAC from accessing a potentially significant source of funds—FOP's own members. On May 4, 2006, the Philadelphia City Council, under the administration of then-Mayor John F. Street, passed City Bill No. 060181, an ordinance that authorized payroll deductions for FOP members who elected to contribute to COPPAC. If the ordinance were implemented, COPPAC could receive funds that are automatically deducted from officers' paychecks on a biweekly basis. COPPAC emphasizes that individual contributors would have no ability to direct who receives their donations because they are distributed at the discretion of FOP's executive board, which chooses whom to fund.

Although City Bill No. 060181 remains on the books, the current administration, under Mayor Michael A. Nutter, refuses to implement it as violative of the Charter ban. If the ban is lifted, FOP intends to distribute forms to all recruits on "the first day they would be in attendance" at the police academy, so they may authorize paycheck deductions to COPPAC. A135.

B

The Charter's contribution ban is but one of many prohibitions that aim to insulate the police from political influence. In 2006, the Ethics Board issued Regulation 8, which interprets the political restrictions on city employees in the Charter. While only the police are subject to the contribution ban, *see* Bd. of Ethics Reg. No. 8, § 8.8, Regulation 8 bars all city employees from engaging in a wide range of political activities—defined as "activity directed toward the success or failure of a political party, candidate, or

7

partisan political group." *Id.* § 8.1(n).[6] The Ethics Board has construed Regulation 8 to forbid all city employees from engaging in political activity while on duty, in uniform, or using city resources; using their authority for any political purpose; serving on the national, state, or local committee of a political party; serving as an officer of a partisan political group; or taking part in the management or affairs of a political party, campaign, or partisan political group. *See id.* §§ 8.3–11.

These restrictions mirror those in the Hatch Act, 5 U.S.C. § 7324(a)(2), which prohibits federal employees from taking "an active part in political management or in political campaigns," and has withstood multiple challenges to its constitutionality. *See, e.g.*, *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO* (*Letter Carriers*), 413 U.S. 548, 566–67 (1973) (holding that Congress's interest in maintaining an apolitical bureaucracy justified the Hatch Act's restrictions on political activity); *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 101 (1947) (same); *see also Broadrick v. Okla.*, 413 U.S. 601, 611–12 (1973) (holding, in a companion case to *Letter Carriers*, that States may enact Hatch Act-type restrictions on the political activities of their civil servants). The FOP Plaintiffs do not challenge these restrictions in this case.

---

[6] A "partisan political group" is defined, tautologically, as "[a]ny committee, club, or other organization that is affiliated with a political party or candidate or whose primary purpose is to engage in political activity." Bd. of Ethics Reg. No. 8, § 8.1(l).

8

Regulation 8 does not preclude city employees from participating in all forms of political activity. The Ethics Board has read the regulation as permitting the right to register and vote in any election; to belong to a political party or partisan group, but not to the group's political committee; and to engage in personal political expression "uncoordinated with a party, candidate, or partisan group." *See* Bd. of Ethics Reg. No. 8, §§ 8.12–14.

Most notably, subpart G of the regulation specifically exempts from restriction "expression and activity that is not political and not directed toward the success or failure of a political party, candidate or partisan political group." *Id.* § 8.17. Accordingly, city employees may publicly express their opinions on political matters or candidates; sign political petitions; and attend political rallies, conventions, fundraisers, and other political events, albeit only as spectators. *Id.* § 8.15. Pursuant to this carve-out, police officers may contribute time and money to nonpolitical organizations that promote causes they care about. As the District Court found, they may donate to groups such as the Sierra Club and the National Rifle Association. Moreover, Regulation 8 does not prohibit city employees from aggregating their voices in political groups, such as FOP, which may endorse and fund political candidates, and publicize the groups' positions on legislative and executive matters.

C

One cannot understand the prohibitions in the Philadelphia Home Rule Charter without reference to its origins and Philadelphia's efforts to combat patronage. In the century preceding the adoption of the 1951 Charter, Philadelphia's civic government was dominated by political

9

party organizations. The city's then-powerful Republican Party machine had a stranglehold on local government, determining who was elected, who was hired, and who received lucrative government contracts. Because it controlled every level of government, the machine built a "patronage army" of city employees, rewarding its own members and subordinates with paid office positions. Phila. Comm. of Seventy, *The Charter: A History*, at 1 (1980) (hereinafter *Charter History*). The machine's reach was so pervasive that citizens' access to basic services, such as street cleaning or police protection, depended on their political support for machine candidates. As one observer summarized, Philadelphia was "a city of petty crimes, small-time gamblers, and five-and-dime shakedowns, where too often a citizen's first protection [was] not the law, the courts or the police, but his ward leader." *Id.* (quoting Dickson Hartwell, *Philadelphia: Corrupt and Not Contented,* Collier's, Aug. 7, 1948, at 14).

According to an expert report submitted by the City,[7] the Charter focused on the police because they were used by machine politicians to control voting. Expert Report by Elliott Shore, at 1 (hereinafter *Shore Report*). In the late 19th and early 20th centuries, the police engaged in aggressive get-out-the-vote efforts, voter fraud, and voter intimidation, often resorting to brute force. For example, police officers turned a blind eye when "professional repeaters" cast fraudulent votes,

---

[7] The District Court found that the reports submitted by the City were "well-researched and credible." A5 n.3. The FOP Plaintiffs have neither objected to the reports nor questioned their veracity.

and in some instances, beat those who protested these practices. *Id.* at 3.

Individual officers who took offense at these excesses had "little choice but to comply with the wishes of the party—they held their jobs as long as they toed the line." *Id.* In addition to distributing plum city jobs, the Republican machine taxed "political assessments" against the police and other city employees. These assessments—forced contributions often collected directly from the wages of city employees—were levied twice a year before general and primary elections. *Id.* at 2. By the first decade of the 20th century, approximately 94 percent of all city employees paid assessments to the Republican machine.

The nefarious relationship between Philadelphia's Republican machine and its police force culminated in September 1917 with the scandal of the "Bloody Fifth" Ward, where officers beat an opposition candidate, terrorized his supporters, and killed a detective who attempted to intervene.[8] The incident led to the arrest of the mayor and the

---

[8] According to one description of the incident:

In the weeks leading up to the primary, police had terrorized anyone in the ward who appeared to support [outsider] James Carey over his [machine-backed] opponent, Common Councilman Isaac Deutsch. . . . During the campaign, businesses owned by Carey supporters were raided and closed down, and their owners were beaten and arrested. A reporter who tried to attend a Deutsch campaign meeting was dragged outside by police,

11

conviction of six police officers, as well as public outcry for the insulation of the civic bureaucracy from politics. Amidst these calls for reform, in 1919 the Pennsylvania Assembly granted Philadelphia a new Charter, which enacted a series of reforms aimed at reducing corruption within government and the police department.[9] For example, one provision of the 1919 Charter forbade all police officers from coming within 50 feet of a polling place, except to vote or when needed to make an arrest, after which the officers were required to "at once withdraw." 1919 P.L. 581, Art. XIX, § 23. Another provision, targeted at the local machine's practice of levying political assessments, prohibited members of the Philadelphia

> punched, and then arrested. Any "bluecoat," as policemen were called, who refused to participate in the terror was transferred out of the district.

Maximilian Potter, *The Last Days of the Bloody Fifth*, Phila. Magazine, Aug. 2000, *available at* http://www.phillymag.com/Archives/2000Aug/bloody1.html.

[9] The 1919 Charter included several provisions that were contained in the Shern Law, a civil service code enacted by the Pennsylvania Assembly in 1905 that prohibited certain political activities by city employees. Among other restrictions, the Shern Law barred city employees from making and soliciting political assessments. *Shore Report* at 5. Like the 1919 Charter, the Shern Law's "effort to prohibit political activity by city employees . . . proved to be an abject failure." *Id.* (quoting Clinton R. Woodruff, *Some Permanent Results of the Philadelphia Upheaval of 1905–06*, 13 Am. J. Soc. 252, 263 (1907)).

Police and Fire Departments from making any political contributions—the predecessor of the contribution ban at issue in this case. *Id.* One commentator described the purpose of the 1919 Charter's restrictions, as well as early attempts at civil service regulations, this way:

> The history of the urban police in the early part of the twentieth century is closely entwined with the political history of the city. . . . Municipal and police corruption scandals profoundly affected police departments as reformers attempted to *neutralize the police from political patronage* and to curb police protection of rackets and organized criminal activity. . . . *The first step was to transform the quasi-military bureaucracy of police organizations into a legalistic and technocratic bureaucracy.* . . . It was a way to hold police accountable to bureaucratic rather than political authority. . . . Moreover, bureaucratization was a means of insulating the appointment and promotion of police officers from political patronage by requiring standards of merit.

*Shore Report* at 5 (quoting Albert J. Reiss, Jr., *Police Organization in the Twentieth Century*, 15 Crime & Just. 51, 57 (1992)) (emphases added and internal quotation marks omitted).

These efforts in 1919 had only minimal effect, as the patronage system persisted through the 1940s, and with it, rampant corruption, including politically sanctioned criminal enterprises facilitated by the police. *Charter History* at 4. "A vast three-cornered and intimate alliance was set up [among]

13

police, the corrupt politician and the gangster. Tributes were paid systematically by the privileged law-breaker to certain of the police and divided with certain of the politicians." *Shore Report* at 7–8 (quoting David Harold Kurtzman, *Methods of Controlling Votes in Philadelphia*, Ph.D. dissertation, University of Pennsylvania, at 97–98 (1935)).

It appears from the City's reports that the 1919 Charter was ineffective not because it failed to place adequate restrictions on municipal employees, but because it retained a weak executive that was subject to political manipulation. *See, e.g.*, *Charter History* at 3. Management was shared by the mayor, who was popularly elected, and members of the City Council, who were overwhelmingly selected and endorsed by the Republican machine. The City Council also retained the authority to appoint the Civil Service Commission; as a result, any civil service requirements that should have insulated public employees from political patronage were easily circumvented, and the restrictions in the 1919 Charter—such as the prohibition on collecting political assessments—were ignored.

Attempts at reform were unsuccessful until 1949, when candidates endorsed by the Republican machine, who had stymied attempts to overhaul the 1919 Charter, were defeated in municipal elections. *Charter History* at 10. The Committee responsible for drafting what would later become the 1951 Home Rule Charter—the document at issue in this case—was emphatic about the city's need for a strong, popularly elected executive. It also insisted that the reformed Charter be approved by the electorate of Philadelphia, so "the city could move away from the discredited 1919 Charter and the depredations of machine politics in the city." *Id.* In addition to enacting structural changes to city government,

14

the 1951 Charter incorporated its predecessors' controls on public employees' participation in political activities in an attempt to move toward cleaner government.

One of the restrictions carried over from the 1919 Charter was section 10-107(3), the ban on political contributions by police officers that is at issue in this case. The annotation to that section elaborates the rationale for retaining the ban: "Voluntary contributions for political purposes are permitted to be made by civil service employees except that, *because of the nature of their duties*, policemen . . . may not under any circumstances make any contributions for political purposes." Ann. to 351 Pa. Code § 10.10-107(3) (emphasis added). The annotation continues: "[m]erit principles of government employment require the divorcement of politics from such employment. They presuppose employment upon merit and not because of political connections, powers and pressures. They also presuppose that governmental employment will not serve as a means for political tribute to maintain political parties and regimes." *Id.*

In addition to the 1951 Home Rule Charter, the City of Philadelphia and the Commonwealth of Pennsylvania have instituted a number of other reforms to promote integrity and professionalism within the police force. The Philadelphia Civil Service Regulations, which were enacted in 1953, contain detailed rules as to the hiring, transfer, layoff, and discipline of city employees. Likewise, Pennsylvania Act 111 of 1968, 43 Pa. Cons. Stat. §§ 217.1–10, and the Pennsylvania Labor Relations Act, 43 Pa. Cons. Stat. §§ 211.1–13, have enabled police officers to organize in unions for collective bargaining purposes, with the result of insulating individual officers from the political pressure of

negotiating their own employment contracts. As the FOP Plaintiffs observe in their appellate brief, "[n]ow, virtually every aspect of the working conditions of police officers is subjected to scrutiny by labor arbitrators, the judiciary, and the Civil Service Commission." FOP Br. at 6.

For its part, the City maintains that police corruption remains a serious concern. As support for this position, the City entered into the record newspaper articles about police and official misconduct, which describe, *inter alia*, police officers disciplined for committing crimes, engaging in drug dealing, and abusing citizens. One article notes that "corruption on the force has always been a problem," and details the Philadelphia Police Department's ongoing attempts to address the "public's confidence in the department's ability to rid itself of bad cops." A333–34. Another article reports that the department's reputation for integrity was significantly undermined when twenty-nine officers were convicted of corruption. The record is replete with articles about the recent trials and convictions of judges and public employees for fraud, kickbacks, and extortion.

D

It is important to note that the Charter ban applied originally not only to the police, but also to the fire department. This changed in 2003, however, when the Philadelphia firefighters' union, in a case remarkably similar to this one, successfully challenged the ban as an unconstitutional infringement on its members' First Amendment rights. *Phila. Fire Fighters' Union Local 22, AFL-CIO v. City of Phila.*, 286 F. Supp. 2d 476, 482 (E.D. Pa. 2003). As a result, the union obtained a permanent injunction preventing the City from disciplining uniformed firefighters

who contributed to the union's political action committee, FIREPAC. The City did not appeal the decision and no longer enforces the ban against Philadelphia firefighters.

On April 28, 2011, FOP, relying on the *Fire Fighters* decision and the City Council's enactment of Bill No. 060181, demanded that the City initiate payroll deductions to COPPAC for FOP members. The City responded that the Charter ban remained in effect against the police despite the *Fire Fighters* decision, which it considered distinguishable. The City continues to maintain that the Charter ban is justified against the police in light of the "unique and critically important nature of the duties of the Police Department and its status in the community." A92. It notes that "[p]olice, because of their position as guardians of the public safety and impartial enforcers of the law, must be, and must be perceived to be, above reproach and shielded from politically-influenced decision making." *Id.* According to the City, "[s]uch public entanglement in politics, potentially damaging to public trust in police impartiality, is legitimately sought to be avoided by the complete divorcement of the police from financial support of particular candidates." A93.

E

On May 18, 2011, after learning that the City intended to enforce violations of the Charter ban, the FOP Plaintiffs commenced this action under 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Pennsylvania, claiming, *inter alia*, that the ban violated their First Amendment rights to political expression and association. The District Court granted the City's motion for summary judgment and dismissed the case. *Lodge No. 5 of the*

17

*Fraternal Order of Police v. City of Phila.*, No. cv-11-3256, 2013 WL 638615 (E.D. Pa. Feb. 21, 2013).

The District Court determined that the standard set forth in the Supreme Court's decision in *United States v. National Treasury Employees Union* (*NTEU*), 513 U.S. 454 (1995), controlled, and required the City to establish that "the interests of [police department] members, and of the public, in [police department] members' political contributions are outweighed by the City's interest in preventing those contributions' necessary impact on the actual operation of city government." 2013 WL 638615, at *4 (citing *NTEU*, 513 U.S. at 468).

The District Court noted that the ban's impact on speech regarding issues of public concern was mitigated by the fact that police officers, pursuant to the Charter's implementing regulation, could still express their views about city government in a nonpartisan way. *Id.* at *7. Moreover, "Philadelphia's history of government corruption reveals [the City's concerns] are real and the need for the ban is compelling." *Id.* at *8. The Court found that while the precise impact of the ban was unclear, it was a part of comprehensive reforms that played a role in dismantling the old Republican political machine, curtailing unchecked political patronage, and rebuilding public confidence in the police department and city government. *Id.* at *9. Further, "the record . . . does not demonstrate that the threat of political corruption has been eliminated," and "corruption within city government, including within the [police department], remains a major concern." *Id.*

Having determined that the City established real harms, the Court ruled that the ban "alleviate[d] these harms

18

in a direct and material way," and constituted a "reasonable response to the posited harms." *Id.* at \*10 (quoting *NTEU*, 513 U.S. at 475–76). It found the ban was narrowly tailored because the City identified a "means through which the corrupt patronage was sustained—compelled political contributions from [police department] members—and cut off that source of party control." *Id.* The Court also ruled that the fact that donations to political candidates would be made by COPPAC did not insulate members of the police department from political pressure. *Id.* Accordingly, it concluded that the Charter ban and its implementing regulation did not violate the First Amendment rights of the union and its members.

This timely appeal followed.

## II

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over the District Court's summary judgment, *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 454 (3d Cir. 2003), and will affirm if the moving party establishes that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III

This case presents a narrow question: whether the Charter ban and its implementing regulation, as applied to the FOP Plaintiffs, violate the First Amendment. We do not consider the full sweep of activities potentially restricted by

19

the ban—for instance, whether police officers may be prohibited from contributing directly to political candidates. Instead, we review whether the Charter ban, in the context of the other political activities permitted and prohibited by Regulation 8, may constitutionally bar Philadelphia police officers from making voluntary contributions to a political action committee.

A

As the City rightly concedes, the Charter ban on political contributions constitutes a substantial burden on the FOP Plaintiffs' First Amendment rights. *See Buckley v. Valeo*, 424 U.S. 1, 21 (1976); *see also McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1440–41 (2014) (plurality opinion) ("There is no right more basic in our democracy than the right to participate in electing our political leaders."). Indeed, "the First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *McCutcheon*, 134 S. Ct. at 1441 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). Limitations on campaign contributions, such as the Charter ban at issue here, prevent the "symbolic expression of support" evidenced by that donation. *Buckley*, 424 U.S. at 21. Therefore, such restrictions significantly curtail the exercise of an individual's right to participate in the electoral process through both political expression and political association. *See id.* at 44–45.

There is no question that "money amassed from the economic marketplace" has a significant role in funding political speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 314 (2010). The amount an individual or group spends on political communication during a campaign necessarily affects "the number of issues discussed, the depth

20

of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19. For this reason, political action committees, such as COPPAC, play an increasingly dominant role in politics: by pooling funds and voices, they present an opportunity for individuals to participate effectively in the political process. *Cf. Fed. Election Comm'n v. Nat'l Conservative Action Comm.*, 470 U.S. 480, 495 (1985) ("To say that [plaintiffs'] collective action in pooling their resources to amplify their voices is not entitled to First Amendment protection would subordinate the voices of those with modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources.").

Here, the FOP Plaintiffs claim that their inability to contribute to COPPAC has prevented the police from advocating effectively on issues of concern. They have presented compelling evidence that the Charter ban has hurt the interests of the police, and that FOP, with its depleted accounts, has been unable to disseminate information or convince legislators of police officers' needs and concerns regarding wages, pension benefits, and working conditions.

B

Because the Charter ban restricts officers' rights to speak on matters of public concern, *see Connick v. Myers*, 461 U.S. 138, 146 (1983), we review the ban using the framework of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and balance "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.

21

In *NTEU*, the Supreme Court clarified how courts should apply *Pickering* when a restriction operated as an *ex ante* prohibition on speech. 513 U.S. at 467. *NTEU* involved a provision of the Ethics in Government Act, 5 U.S.C. § 501(b), that prohibited government employees from accepting honoraria for making speeches or writing articles, without regard to whether the speech or article was related to the official's duties. *See* 513 U.S. at 457. In striking down the honoraria ban, the Court noted that, unlike in *Pickering* and its progeny, the statute did "not involve a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities," but rather resulted in a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.* at 466–67. Because the ban chilled speech before it occurred, the Court stated "the Government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary decision." *Id.* at 468. "The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by the expression's 'necessary impact on the actual operation' of the Government." *Id.* (quoting *Pickering*, 391 U.S. at 571). Accordingly,

> [w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are *real, not merely conjectural*, and that the regulation will in fact

22

alleviate these harms in a *direct and material way*.

*Id.* at 475 (quoting *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 664 (1994)) (emphases added).

While the Court in *NTEU* recognized that Congress had an "undeniably powerful" interest in maintaining its employees' administrative integrity, it deemed the ban "crudely crafted" to serve this interest. *Id.* at 477. For example, although payment of honoraria to higher-ranking officials could create an appearance of impropriety, the same could not be said of the "vast group of present and future employees" "with negligible power to confer favor on those who might pay to hear them speak or to read their articles." *Id.* at 468, 473. Nor had Congress provided any "evidence of misconduct related to honoraria in the vast rank and file of federal employees." *Id.* at 472. The Court also questioned Congress's rationale for applying the honoraria ban to speeches and articles that had nothing to do with employees' official duties, as well as its justification for limiting the ban to "expressive activities" when other extracurricular activities had similar opportunity for abuse. *Id.* at 472–74, 475. These inconsistencies, among others, "diminish[ed] the credibility of the Government's rationale." *Id.* at 476.

C

We had occasion to review the Supreme Court's decision in *NTEU* in *Swartzwelder v. McNeilly*, 297 F.3d 228 (3d Cir. 2002). In that case, we held that the *NTEU* rubric applied whenever a "'generally applicable statute or regulation, as opposed to a particular disciplinary action,' restricts a government employee's expression on a matter of

23

public concern." *Id.* at 237 (quoting *Latino Officers Ass'n v. City of New York*, 196 F.3d 458, 464 (2d Cir. 1999)). We clarified that the *NTEU* standard governed even when a law regulated only a narrow category of speech of employees of a single city department—in *Swartzwelder*, a municipal order that required employees of the Pittsburgh Police Bureau to obtain permission before testifying as an expert witness in court. *See id.*

The Charter ban at issue in this appeal is similarly a "generally applicable statute" that applies to employees of the Philadelphia Police Department. Consistent with *Swartzwelder*, we agree with the District Court that *NTEU* provides the standard applicable to this case.[10]

---

[10] Perhaps anticipating it has not made a sufficient showing under *NTEU*, the City urges us to eschew that case and instead follow an alternative framework purportedly set forth in *U.S. Civil Service Commission v. National Association of Letter Carriers, AFL-CIO* (*Letter Carriers*), 413 U.S. 548 (1973). There, the Supreme Court found that Congress's concerns about bureaucratic efficiency and political influence justified certain restrictions on employees' overt political participation. *Id.* at 564. The City asks us to extend *Letter Carriers*'s holding to restrictions on political contributions, contending that "restrictions on government employee *political activity* are accorded greater deference than other restrictions on employee speech." City Br. at 20 (emphasis added).

However, as we discuss in section V.A, *infra*, *Letter Carriers* did not set forth a different standard for reviewing restrictions on political activity, but instead represents an

Accordingly, to prevail, the City must make two showings: first, that it has "real, not merely conjectural" harms; and second, that the ban as applied to the FOP Plaintiffs addresses these harms in a "direct and material way." *NTEU*, 513 U.S. at 475. As we shall explain, we agree with the District Court that the City has established real harms, but we disagree with its conclusion that the Charter ban is an appropriately tailored means of addressing those concerns.

---

instance where the Supreme Court applied *Pickering*'s case-by-case balancing test and found that the government's interests prevailed. Nor did the *NTEU* Court, in distinguishing *Letter Carriers*, suggest that political restrictions should be reviewed under a more deferential framework. Rather, it found that the Hatch Act's "employee-protective rationale" was more compelling than the honoraria ban's "general interest in workplace efficiency," and that, unlike its efforts with the honoraria ban, "Congress effectively designed the Hatch Act to combat demonstrated ill effects" of its interests. 513 U.S. at 471. Indeed, the *NTEU* Court explicitly cast *Letter Carriers* as a specific application of the *Pickering* test, clarifying: "Because the discussion in [*Letter Carriers*] essentially restated in balancing terms our approval of the Hatch Act in *Public Workers v. Mitchell*, we did not determine how the components of the *Pickering* balance should be analyzed in the context of a sweeping statutory impediment to speech." *Id.* at 467 (citation omitted). Absent a more persuasive argument, we decline to read *Letter Carriers* as creating a separate framework for review, and apply *NTEU* in accordance with our prior opinion in *Swartzwelder*.

## IV

To demonstrate "real, not merely conjectural" harms, a government must not only identify legitimate interests, but also provide evidence that those concerns exist. *Id.* at 472 (finding that Congress had failed to show "real" harms because, while its "interest [was] undeniably powerful," it failed to cite evidence of misconduct); *cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden.").

Here, the City has articulated four legitimate interests drawn from its experience with machine politics. First, the City must ensure that the police enforce the law without bias or favoritism, which includes even the appearance of "practicing political justice." City Br. at 26. Second, it seeks to enable employment and advancement within the Philadelphia Police Department based on merit, not political affiliation or performance. Third, the City wishes to protect subordinate employees from having to support candidates favored by their superiors. And finally, the City has an interest in maintaining the efficiency and quality of the services provided by the police.

The interests identified by the City have longstanding pedigree and have been repeatedly recognized by the Supreme Court as justifying the curtailment of public employee speech. *See, e.g.*, *Letter Carriers*, 413 U.S. at 564; *see also Citizens United*, 558 U.S. at 341 (emphasizing the continued validity of *Letter Carriers* and its proposition that "there are certain governmental functions that cannot operate without some restrictions on particular kinds of speech"); *Broadrick*, 413 U.S. at 611–12; *Mitchell*, 330 U.S. at 101.

26

In *Letter Carriers*, for example, the Supreme Court upheld the constitutionality of a section of the Hatch Act that prohibited federal employees from taking "an active part in political management or in political campaigns." 413 U.S. at 550 (quoting 5 U.S.C. § 7324(A)(2)). Under that law, federal employees were precluded from, *inter alia*, running for political office, organizing a partisan political campaign, and actively soliciting votes and funds for a candidate.[11] *Id.* at 556.

---

[11] The provision of the Hatch Act at issue in *Letter Carriers*, 5 U.S.C. § 7324(A)(2), provides in part:

> (a) An employee in an Executive agency or an individual employee employed by the government of the District of Columbia may not—
>
> (1) use his official authority or influence for the purpose of interfering with or affecting the result of an election; or
>
> (2) take an active part in political management or in political campaigns.
>
> For the purpose of this subsection, the phrase "an active part in political management or in political campaigns" means those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service

The Supreme Court's decision turned on Congress's legitimate interest in regulating the conduct of its employees: it reasoned that such restrictions were necessary if government were "to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences." *Id.* at 564. Four interests—which the City echoes in this case—were particularly pertinent. First, Congress had a generalized interest in ensuring that federal employees administered the "impartial execution of the laws" in accordance with congressional, not partisan, will. *Id.* at 565. The Hatch Act's mandate against partisan political activities "reduce[d] [such] hazards to fair and effective government." *Id.*

Second, it was important for Congress to maintain a civil service that was politically neutral in fact and in appearance, "if confidence in the system of representative

Commission under the rules prescribed by the President.

(b) An employee or individual to whom subsection (a) of this section applies retains the right to vote as he chooses and to express his opinion on political subjects and candidates.

The Hatch Act included a specific exemption for political contributions, providing that "[a]n employee may make political contributions to any committee, organization, or person not employed by the United States." *Id.*; *see also* 5 C.F.R. pt. 733 (allowing employees to "[m]ake a financial contribution to a political party or organization").

Government is not to be eroded to a disastrous extent." *Id.* Relatedly, Congress expressed a legitimate interest in preventing "the rapidly expanding Government work force [from being] employed to build a powerful, invincible and perhaps corrupt political machine." *Id.* The Hatch Act, by barring federal employees from formal positions in partisan political groups, addressed these concerns because it precluded parties from "using . . . federal employees . . . to man [their] political structure and political campaigns." *Id.* at 565–66.

Finally, the Court highlighted Congress's interest in ensuring that federal employees did not feel pressured or coerced, either expressly or implicitly, to vote or perform political chores "to curry favor with their superiors rather than act out of their own beliefs." *Id.* at 566. These, the Court held, were "*obviously important interests* sought to be served by the limitations on partisan political activities." *Id.* at 564 (emphasis added).

The Supreme Court's recognition of these interests in *Letter Carriers* adhered to almost a century of consistent precedent. In *Mitchell*, a case whose holding *Letter Carriers* "unhesitatingly reaffirm[ed]," *id.* at 556, the Supreme Court upheld the Hatch Act's restrictions against an employee who had neither policymaking authority nor contact with the public, reasoning that Congress had a legitimate fear of "the cumulative effect on employee morale of political activity by all employees who could be induced to participate actively." 330 U.S. at 101. *Mitchell*, in turn, relied on *Ex parte Curtis*, 106 U.S. 371 (1882), which permitted Congress to prohibit political contributions between government employees. There, the Supreme Court validated Congress's concern that government favor could be channeled through political

connections: "If contributions . . . may be solicited by others in official authority, it is easy to see that what begins as a request may end as a demand." *Id.* at 374. The *Curtis* Court noted that such contributions would "quite as likely be made . . . to avoid a discharge from service, not to exercise a political privilege." *Id.*

In light of the City's "obviously important interests," *Letter Carriers*, 413 U.S. at 564, our inquiry turns to whether the City has presented adequate evidence of harm connecting political contributions with systemic corruption by the police. As we summarized in section I.C, *supra*, the City has entered into the record over a century of "concrete experience with the evils of the political spoils system." *NTEU*, 513 U.S. at 483 (O'Connor, J., concurring in part and dissenting in part). The City has shown, and the FOP Plaintiffs concede, that the City's concerns about the connection between police abuse and machine politics were justified when the Home Rule Charter was enacted in 1951.

Over sixty years later, however, the record is essentially devoid of the harms that motivated the Charter's passage. To suggest today that there is a Republican machine that controls Philadelphia politics would be viewed as absurd by even a casual political observer. Indeed, with that party having been reduced to a mere 12 percent of registered voters,[12] it is now reasonable to conclude that the Democratic

---

[12] As of June 30, 2014, of the 1,031,913 registered voters in Philadelphia County, 78 percent identified as Democrats and 12 percent registered as Republicans. *See* Pa. Dep't of State, Voter Registration Statistics, *available at* http://www.dos.state.pa.us/portal/server.pt/community/voter_registration_statistics/12725. Over the last decade alone,

Party dominates the city's politics.[13] Regardless of whether such is the case, the City submitted no evidence to suggest that the Democratic Party has corrupted, or is attempting to corrupt, the Philadelphia Police as the Republican Party had done during the first half of the twentieth century.[14]

---

Republicans have experienced a 30 percent decline in registered voters. *Id.*

[13] In the 2012 general election, Democrats won all 40 of the races on the ballot in Philadelphia County. In 2007, they prevailed in 21 of 22 races in Philadelphia's municipal elections. *See* Office of Phila. City Comm'rs, Prior Year Election Results, *available at*: http://www.philadelphiavotes.com/en/resources-a-data/prior-year-election-results.

[14] Our observation that the City failed to offer evidence of such harm should not be taken to mean that political corruption writ large no longer exists. The relatively recent convictions of local Democratic politicians suggest that corruption remains an ongoing problem in Philadelphia. *See, e.g.*, *Ex-City Official Is Convicted in Philadelphia Corruption Case*, N.Y. Times, May 10, 2005, *available at* http://www.nytimes.com/2005/05/10/national/10philly.html?fta=y&_r= (conviction of Philadelphia City Treasurer in 2005 for, *inter alia*, fraud and extortion); *Councilman Found Guilty on 18 Counts*, The Daily Pennsylvanian, Mar. 20, 2006, *available at* http://www.thedp.com/article/2006/03/councilman_found_guilty_on_18_counts (conviction of City Councilman Rick Mariano in 2006 for bribery); *see also* George Anastasia, *George Schwartz, Abscam Figure, is Dead at 95*, Phila.

Further, the statutory backdrop of the Charter ban has changed significantly since it was first enacted in 1951. The City now has in place a system of comprehensive civil service regulations that detail requirements for civic employment, advancement, and dismissal. Collective bargaining arrangements further insulate individual officers from the pressure of negotiating their own employment contracts. Moreover, the City offered no evidence that FOP's internal mechanisms are linked with hiring and advancement within the Philadelphia Police Department or that officers are pressured to contribute to political causes supported by FOP.

In fact, the City's only showing of present-day police corruption consists of articles about "dirty cops" and corrupt politicians. We recognize that such misconduct by officers and politicians remains a significant concern. But these problems are of a completely different nature than those that gave rise to the 1951 Charter. Unlike the systemic corruption that led to the Charter ban, the City's episodic and individualized evidence shows only that human frailty affects police officers, just as it affects all walks of life. *Cf. Wachsman v. City of Dallas*, 704 F.2d 160, 167 (5th Cir. 1983) (noting that similar contribution restrictions targeted "such human traits as personal ambition, greed, fear, and the like"). Thus, while the City has demonstrated historic harm in

Inquirer, Mar. 27, 2010, *available at* http://articles.philly.com/2010-03-27/news/25215897_1_council-president-councilman-political-career (describing the role of several members of the Philadelphia City Council in the 1980 Abscam scandal). We emphasize that the City has provided no evidence that these convictions are related to systemic police corruption.

spades, its evidence of recent politically-orchestrated harm is non-existent.

This inadequacy does not, however, render incorrect the District Court's finding that the City satisfied the first prong of *NTEU*. A legislature need not, in the absence of concrete evidence to the contrary, rejustify past harms in light of changed circumstances.[15] *See, e.g.*, *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 162 n.9 (2003), *abrogated on other grounds by Citizens United*, 558 U.S. 310; *Letter Carriers*, 413 U.S. at 567; *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938). Courts have taken a cautious approach when reviewing longstanding restrictions, acknowledging that when regulation has succeeded, it is often difficult to discover evidence that the targeted abuses continue to exist. *See Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001) (recognizing the "difficulty of mustering evidence to support long-enforced statutes" because there is no recent experience absent the restriction) (citation and internal quotation marks omitted); *Letter Carriers*, 413 U.S. at 567 (deferring to Congress's determination of harm, as the Court was "not now in any position to dispute it"). This is true with corruption, which, given its amorphous nature, is particularly hard to quantify and prove. As a result, "judicial restraint is particularly warranted where . . . we deal with a [legislative]

---

[15] This rule does not, as the FOP Plaintiffs contend, place an improper burden on the police to prove an *absence* of harm. The City has already demonstrated harm through historic data; its concerns are not "merely conjectural" because they actually occurred. *NTEU*, 513 U.S. at 475.

judgment that has remained essentially unchanged." *Beaumont*, 539 U.S. at 162 n.9.

In our opinion, the Charter ban warrants such judicial caution: it addressed real harms at the time of its enactment, was the product of decades of legislative adjustment, and has remained unchanged for more than six decades.[16] *Cf. Fed. Commc'ns Comm'n v. League of Women Voters of Cal.*, 468 U.S. 364, 401 n.27 (1984) (noting that the Hatch Act "evolved over a century of governmental experience with less restrictive alternatives that proved to be inadequate to maintain the effective operation of government"). This does not mean that a government may indefinitely restrict its employees' First Amendment rights by referencing some bygone harm. *Cf. McCutcheon*, 134 S. Ct. at 1456 ("The absence of such a prospect today belies the Government's asserted objective of preventing corruption or its appearance."). But here, the FOP Plaintiffs have offered little to dispel the City's concerns. Although civil service reforms and collective bargaining legislation have significantly altered the regulatory environment, the FOP Plaintiffs have not

---

[16] The FOP Plaintiffs contend that City Bill No. 060181—the ordinance that provides for payroll deductions to COPPAC—constituted a legislative determination that the contribution ban is no longer necessary. We disagree because the ordinance itself has no legal significance, as there is no evidence the City Council had the Charter ban in mind when it enacted the ordinance, and the Charter may be amended only through the submission of proposed changes to the general electorate. *See* Pa. Cons. Stat. § 13106.

shown that the City's concerns of police partiality and politicized personnel practices are now unfounded.[17]

---

[17] The FOP Plaintiffs cite *Fire Fighters* and *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), as requiring legislators to provide present-day evidence of harm. These cases, however, are distinguishable because those plaintiffs demonstrated an *absence* of harm.

In *Fire Fighters*, which struck down the Charter ban as applied against Philadelphia's firefighters, the district court found that the City's two proffered concerns were unsubstantiated by the record. 286 F. Supp. 2d at 482. First, the City contended—as it does in this appeal—that the ban on political contributions was necessary to prevent politicized hiring and promotion practices. However, the union presented evidence that in spite of politician intervention, "the [Fire] Commissioner relied on detailed protocols on making personnel decisions." *Id.* at 481. Philadelphia's police, by contrast, have not made such a demonstration. Second, the City contended that firefighters' donations would compromise the integrity of fire code inspections. This, too, the district court found illogical, as non-uniformed employees of the fire department, who could contribute to FIREPAC (the union's political action committee), also conducted fire inspections. *Id.* at 481–82.

Similarly, the Supreme Court's decision in *Shelby County* rested on conclusive evidence that the circumstances motivating the enactment of section 4 of the Voting Rights Act had changed "dramatically." 133 S. Ct. at 2625. There, the *Shelby County* Court, in assessing the validity of section 4 under the Fourteenth Amendment, found that the provision's

Moreover, the City has demonstrated a real risk of future harm. For example, COPPAC's ability to fund candidates for judicial office may prove to be a concern, as the police frequently testify in court and interact with the judicial system. FOP's practice of distributing "courtesy cards" to large donors also may threaten public confidence in the police's impartial enforcement of the law: because police exercise significant discretion in their everyday work, a card that extends the union's "every courtesy" to its holder may become an improper ticket to preferential treatment. Similarly, the institution of paycheck deduction mechanisms—here, City Bill No. 060181—may create pressure on individual officers to donate to COPPAC, because when contributions are "solicited by others in official authority . . . what begins as a request may end as a demand." *Curtis*, 106 U.S. at 374.

In sum, the District Court did not err when it found that the City identified legitimate interests in the efficiency and integrity of its police. And while there is no recent evidence of systemic political corruption of the police, the FOP Plaintiffs have failed to dispel the City's legitimate historic concerns. Accordingly, we conclude that the City has demonstrated "real, not merely conjectural" harms under *NTEU*.

---

formula relied on decades-old data that captured discriminatory literacy tests and poll taxes—practices that had since been eliminated. *See id.* at 2621–22.

V

This showing of harm does not render the Charter ban constitutional, however, as the City must also satisfy *NTEU*'s second prong—namely, that the ban will "in fact alleviate [its proposed] harms in a direct and material way." 513 U.S. at 475 (citation omitted).

While *NTEU* did not explicitly establish a tailoring requirement, we have noted that "such a requirement seems to be implicit in the Court's discussion." *Swartzwelder*, 297 F.3d at 236. Indeed, in holding unconstitutional the honoraria ban at issue in that case, the *NTEU* Court found that the ban was "crudely crafted" and not "a reasonable response to the [government's] posited harms." 513 U.S. at 475–77; *see also McCutcheon*, 134 S. Ct. at 1456 ("In the First Amendment context, fit matters."). Proper tailoring does not require the regulation to redress the harm entirely. *See Mariani v. United States*, 212 F.3d 761, 774 (3d Cir. 2000). But when "the burden comes closer to impairing core first amendment values, or impairs some given first amendment value more substantially, the requisite closeness of fit of means and end increases accordingly." *Morial v. Judiciary Comm'n of La.*, 565 F.2d 295, 300 (5th Cir. 1977) (distilling *Elrod v. Burns*, 427 U.S. 347 (1976), *Buckley*, 424 U.S. 1, and *Letter Carriers*, 413 U.S. 548); *see also NTEU*, 513 U.S. at 483–84 (O'Connor, J., concurring in part and dissenting in part) (under *Pickering*, "[a]s the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification").

Traditionally, contributions are not afforded the same protections as direct forms of political expression—for example, campaign expenditures—because "the

37

transformation of contributions into political debates involves speech by someone other than the contributor." *Beaumont*, 539 U.S. at 161–62 (citing *Buckley*, 424 U.S. at 20–21). "[B]ecause contributions lie closer to the edges than to the core of political expression," restrictions on political contributions are "merely 'marginal,'" *id.* at 161, and are permissible if the government can show they are "closely drawn" to serve a "sufficiently important interest." *Buckley*, 424 U.S. at 25; *see also McCutcheon*, 134 S. Ct. at 1437 (adhering to "*Buckley*'s distinction between contributions and expenditures and the corresponding distinction in standards of review").

But "[e]ven when the Court is not applying strict scrutiny," it still requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, . . . that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *McCutcheon*, 134 S. Ct. at 1456–57 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)) (internal quotation marks omitted). For the reasons that follow, we find that the Charter ban, as implemented and applied in this case, is poorly tailored to the City's articulated interests. Because the ban is not "closely drawn to avoid unnecessary abridgment of associational freedoms," *Buckley*, 424 U.S. at 25, it unconstitutionally restricts the FOP Plaintiffs' participation in the political process.

A

The City argues that *Letter Carriers* requires us to defer to legislative judgment when determining whether a

38

restriction on political activity adequately balances the interests of the government and its employees. As support for this proposition, it emphasizes the following quotation from *Letter Carriers*:

> Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act.

413 U.S. at 564. Several courts, including two other courts of appeals, have relied on this language to uphold regulations prohibiting public employees from contributing directly to political campaigns. *See, e.g.*, *Int'l Ass'n of Fire Fighters v. City of Ferguson*, 283 F.3d 969, 971 (8th Cir. 2002) (upholding a provision that prohibited employees from giving money to any candidate for mayor or city council); *Reeder v. Bd. of Police Comm'rs*, 733 F.2d 543, 547 (8th Cir. 1984) (upholding a Missouri statute that prevented police officers from contributing to political campaigns); *Wachsman*, 704 F.2d at 165 (upholding a provision in Dallas's municipal charter that banned public employees from donating to local candidates).

We decline the City's invitation to read *Letter Carriers* as requiring us to abandon the *NTEU* fit analysis. The Supreme Court in *Letter Carriers* did not simply defer to legislative judgment as to what constituted appropriate regulation. Instead, after a careful weighing of the relevant interests, the Court held that Congress had satisfied the *Pickering* analysis. 413 U.S. 564 (quoting *Pickering*, 391 U.S. at 568). Indeed, the Court devoted much of its analysis

39

to matching the Hatch Act's restrictions to Congress's interests. It found that Congress had demonstrated how federal employees' public participation in political campaigns—for example, as a candidate or the head of a political group—had the direct effect of creating an appearance of impropriety and of risking that federal service could be used for political ends. *See id.* In essence, Congress had found a proper solution—perhaps one among many—that created a "sustainable" balance between its concerns and its employees' First Amendment interests. *Id.*; *see also NTEU*, 513 U.S. at 467 (characterizing the *Letter Carriers* decision as an application of the *Pickering* balancing test).

Nor does the City's invocation of *Curtis* and *Kelley v. Johnson*, 425 U.S. 238 (1976), prove persuasive. In *Curtis*, the Supreme Court upheld a statute that prohibited federal employees from soliciting, receiving, and donating political contributions to each other. 106 U.S. at 371. In sustaining the ban, the Court was convinced by Congress's rationales, reminiscent of those offered here, that "government itself may be made to furnish indirectly the money to defray the expenses of keeping the [controlling] political party in power," and that "a refusal [to contribute] may lead to putting good men out of the service, [and] liberal payments may be made the ground for keeping poor ones in." *Id.* at 375. In our view, *Curtis* is of limited relevance to this appeal because it was limited to contributions *between* employees. In fact, the *Curtis* Court was explicit in clarifying that the statute at issue did not "prohibit *all* contributions" by federal employees for political purposes, but "simply forbids their receiving from or giving to *each other*." *Id.* at 371–72 (emphasis added). *Curtis* thus left for another day the consideration of other types of

political contributions, such as those made directly to candidates and to political action committees.

In *Kelley*, the Supreme Court upheld a county regulation that limited the hair length of male police officers, reasoning that the restriction was justified given the "overall need for discipline, esprit de corps, and uniformity" in the police force. 425 U.S. at 246. In doing so, the Court included broad dicta regarding appropriate restrictions on the police:

> [The county] has, in accordance with its well-established duty to keep the peace, placed myriad demands upon the members of the police force, duties which have no counterpart with respect to the public at large. Respondent must wear a standard uniform, specific in each detail. When in uniform he must salute the flag. He may not take an active role in local political affairs by way of being a party delegate or *contributing or soliciting political contributions*. He may not smoke in public.

*Id.* at 245–46 (emphasis added). The City views the expansive language italicized above as a "fairly clear implication . . . that a restriction on contributions would be upheld." City Br. at 29 (quoting *Reeder*, 733 F.2d at 548). We disagree, because the dicta cited cannot bear the weight the City places upon it. *See Toucey v. N.Y. Life Ins. Co.*, 314 U.S. 118, 139–40 (1941) (departing from "[l]oose language" when considering a question "with our eyes open and in the light of full consideration"); *cf. McCutcheon*, 134 S. Ct. at 1447 (declining to be bound by *Buckley*'s anticircumvention holding because the discussion consisted of "three sentences .

41

. . that were written without the benefit of full briefing or argument").

The Eighth Circuit's decision in *Reeder*, though it too upheld a ban on contributions by police officers, is similarly distinguishable. The plaintiff in *Reeder*, an officer of the Kansas City Police Department, was fired for donating to the campaign of a congressional candidate in Independence, Missouri. 733 F.2d at 545. He claimed that the ban should not apply to his donation because the candidate had no connection with local politics or the city's police department. *Id.* The Eighth Circuit, citing a similar state court decision, *Pollard v. Board of Police Commissioners*, 665 S.W.2d 333 (Mo. 1984) (en banc),[18] rejected this argument, reasoning that

---

[18] In *Pollard*, a Kansas City police officer was dismissed after his superiors discovered he had contributed to the campaign of a candidate for his congressional district, in violation of the same Missouri statute. 665 S.W.2d at 335. The *Reeder* court adopted the reasoning in *Pollard* in its entirety. 733 F.2d at 545 ("[T]here is no point in repeating an analysis already so well set out.").

Like Philadelphia, Kansas City was beholden to a patronage system of politics—there, the Democratic Party controlled by "Boss Tom" Pendergast—which was sustained in part by police brutality:

> Policemen who belonged to the party out of power were discharged. Those who remained, and those newly hired, were obliged to profess adherence to and to contribute a portion of their salaries to the support of the dominant political party. There followed substantial discoveries of

the ban was rational given the close connection between local, state, and federal politics. *See Pollard*, 665 S.W.2d at 340. According to the *Reeder* court, a contribution to a federal congressional campaign might well benefit a Kansas City politician who had "made common cause" with a federal candidate, 733 F.2d 547 (quoting *Pollard*, 665 S.W.2d at 340), raising the concern that a politician could "influence for good or ill the career of a city police officer." *Id.*

Unlike *Reeder*, this appeal does not involve officers' *direct* contributions to political candidates, and thus does not implicate the Eighth Circuit's concerns about *quid pro quo* corruption.[19] The Supreme Court reiterated just last Term that

> corruption touching not only the police department but the entire governmental structure of Kansas City.

*Pollard*, 665 S.W.2d at 335. Like the Charter ban in this case, the Missouri statute aimed to protect the police from the pressure to contribute to the party in power, to protect the public from a politicized police force, and to guard against a general rise in municipal corruption. *Id.*

[19] It is also important to note that *Reeder* predates *NTEU*, which imposed a higher burden on the government to justify *ex ante* restrictions on employee speech, and demanded that the government articulate a tighter fit between its means and ends. *Reeder*'s reliance on *Letter Carriers*—the most relevant case at the time—and its since-repudiated characterization of public employment as a conditional privilege, *compare McAuliffe v. Mayor of New Bedford*, 29 N.E. 517, 517–18 (Mass. 1892) ("[A policeman] may have a constitutional right to talk politics, but he has no

"there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors [such as a political action committee] to a candidate, as when a donor contributes to a candidate directly." *McCutcheon*, 134 S. Ct. at 1452. "The risk of *quid pro quo* corruption is generally applicable only to 'the narrow category of money gifts that are directed . . . to a candidate or officeholder.'" *Id.* (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 310 (2003) (Kennedy, J., concurring in part and dissenting in part)); *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2826 (2011) (finding that the intervention of a political action committee that is independent of a specific candidate breaks the "candidate-funding circuit").

Here, the individual Appellants wish to contribute to COPPAC, a political action committee that serves as an intermediary between donors and candidates. As the FOP Plaintiffs emphasize, donors to COPPAC have no say in how the funds are disbursed because FOP's leadership determines whether funds are used for information or for political campaigns. In light of this separation, since *Citizens United*, courts of appeals have consistently invalidated restrictions on contributions to political action committees, even under *Buckley*'s more relaxed standard for restrictions on contributions. *See N.Y. Progress & Protection PAC v. Walsh*,

---

constitutional right to be a policeman."), *with Keyishian v. Bd. of Regents*, 385 U.S. 589, 603–04 (1967), suggest that the Eighth Circuit may have given undue deference to the government's interests.

733 F.3d 483, 487 (2d Cir. 2013) (collecting cases).[20] For this reason, we are unpersuaded by the City's reliance on the Eighth Circuit's 1984 *Reeder* decision—and its concern regarding *quid pro quo* corruption—to justify the Charter ban's restriction on Appellants' First Amendment rights.

B

As our preceding discussion demonstrates, we face a unique regulatory scheme forged from Philadelphia's experience with political patronage, "at a different point in the development of campaign finance regulation." *McCutcheon*, 134 S. Ct. at 1447 (reconsidering anew *Buckley*'s anticircumvention holding in light of current campaign finance decisions). The FOP Plaintiffs' challenge against the Charter ban, as implemented by the current regulatory scheme, "thus merits our plenary consideration." *Id.*

The Supreme Court has expressed skepticism of political speech restrictions based on broad anticorruption rationales in recent campaign finance decisions. Last Term, in *McCutcheon*, it reiterated that Congress may take action only to address *quid pro quo* corruption and not "the appearance of mere influence or access." *Id.* at 1451. This development,

---

[20] *See, e.g.*, *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013); *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010); *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 695 (D.C. Cir. 2010) (en banc); *see also N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293 (4th Cir. 2008) (pre-*Citizens United*).

coupled with the Court's increased solicitude for the First Amendment rights of government workers, *see, e.g.*, *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603–04 (1967), requires us to take care in determining that the Charter ban is closely tailored to the City's aims. Contrary to the District Court, we find that the lack of fit between the City's purported interests and the Charter ban renders the restriction an unacceptable response to the posited harms.

The District Court held that the contribution ban was a reasonable regulation, as it was enacted to end the practice of compulsory political contributions that sustained Philadelphia's political machine. Despite this conclusion, the City has failed, before both the District Court and this Court, to cite a single explanation as to how the contribution ban has directly mitigated its concerns. In fact, the record demonstrates the exact opposite: the 1919 Charter contained the same prohibition on political contributions by the police, but did nothing to undermine the patronage system. Even with the contribution ban in place, machine politics persisted, as the 1919 Charter's perpetuation of a weak executive enabled the manipulation and circumvention of its edicts. For that reason, the District Court expressed uncertainty about the independent impact of the ban:

> It is impossible to determine the degree to which the contributions ban has reduced and continues to ward off endemic corruption in City Government and the [Philadelphia Police Department], although the likely answer is that Philadelphia's era of machine politics ended as a result of the *combined effect* of several measures, including Civil Service reforms, laws

46

insulating government administration from political forces, as well as the challenged ban.

*Lodge No. 5*, 2013 WL 638615, at \*9 (emphasis added). Similarly, none of the City's expert reports, which discuss the efficacy of the Home Rule Charter, attribute success to the contribution ban. Rather, they point to the Charter's institution of a strong mayoral position—a reform made possible only by the concurrent dismantling of the Republican political machine—and the execution of comprehensive civil service regulations as the strongest reasons for reform. *See Charter History* at 3; *Shore Report* at 7. Thus, even if the Charter ban had effect at the time of its enactment—a fact belied by the record—the City now has in place a system of statutory safeguards that more directly address its concerns. In light of these more targeted measures, the Charter ban appears "particularly heavy-handed." *Cf. McCutcheon*, 134 S. Ct. at 1446.

The City also fails to persuade us why the contribution ban should apply only to the police, and not to the approximately 20,000 other individuals in its employ. The record shows that the Republican machine historically extracted political assessments from all civic employees: the practice was so pervasive that, in the early 20th century, the machine collected contributions from 94 percent of the city's workforce. *Shore Report* at 2. If the Charter ban's purpose was to end such compulsory wage contributions, it is unclear why the City would enforce the ban only against the police. Moreover, the City has made no attempt to show that the Democratic Party's recent dominance in Philadelphia politics was achieved through corruption.

47

We understand that in certain circumstances, the City may distinguish police officers from other public employees because of their unique role in law enforcement. *Cf. Broadrick*, 413 U.S. at 607 n.5 (holding, in response to an equal protection challenge, that the government may single out certain classes of employees for restrictions on political expression). No other public role is "charged with the duty to protect life and property, prevent crime, and preserve the public peace and enforce the laws," and the police are the only civic employees entrusted with the legitimate use of lethal force. Note, *The Policeman: Must He Be A Second-Class Citizen With Regard to His First Amendment Rights?*, 46 N.Y.U. L. Rev. 536, 538 (1971) (internal quotation marks omitted). For this reason, we and other courts have allowed legislatures to regulate the police to a greater degree than other civic employees when the restriction serves a meaningful end. *See, e.g.*, *Webb v. City of Phila.*, 562 F.3d 256, 261 (3d Cir. 2009) (prohibiting a policewoman from wearing a headscarf, as it would threaten the perception of neutrality); *see also Kelley*, 425 U.S. at 246; *Reeder*, 733 F.2d at 547; *Muller v. Conlisk*, 429 F.2d 901, 904 (7th Cir. 1970) (finding that the need for internal discipline and paramilitary structure distinguishes policemen from other public servants).

Here, however, the City's concern that the police remain "above reproach," A92, relates only to its general interest in the impartial and apolitical provision of its services—a concern that applies equally to all city employees. The four interests the City has advanced in this case—unbiased law enforcement, merit-based advancement, employee protection, and departmental integrity—speak generally to the efficient operation of civic bureaucracy. Moreover, that the police are involved in public safety does

not salvage the City's cause, as Philadelphia firefighters, who also discharge a critical public safety duty, are not subject to the Charter ban and can readily contribute to FIREPAC. Although the City expresses strong interests in this case, its general power to regulate political expression does not automatically trigger the "lesser included authority" to ban speech by certain groups; its "selectivity must itself pass constitutional muster." *Latino Officers Ass'n*, 196 F.3d at 468 (citing *Schacht v. United States*, 398 U.S. 58, 62–63 (1970)). Because the City does not enforce the Charter ban against the balance of its employees, it must explain why the ban has special significance against the police. We find that its invocation of historic police abuse—when the record shows that the contribution ban in fact aimed to dismantle political assessments levied against almost all of the city's employees—is insufficient to justify the second-class treatment of the police.

In lieu of a more precise explanation, the City focuses its appeal on an amorphous justification for the Charter ban, claiming that the ban is an integral part of a carefully calibrated, comprehensive scheme that insulates the police from "*all* political activity." A265 (emphasis added). The City therefore contends that any change in this carefully designed scheme—for example, striking down the contribution ban—would lead to the parade of horribles detailed in its brief.

The City's argument in this respect is undermined thoroughly by the under-inclusiveness of the current scheme. As Regulation 8 makes clear, the police are hardly removed from politics. Officers, for instance, may engage in political expression so long as it is not coordinated with a partisan political group, and they may, among other activities, belong

49

to a political party, sign political petitions, and attend political events. They may also contribute time and money to nonpartisan political causes, including to organizations that advocate issues of concern to the police. *See generally* Bd. of Ethics Reg. No. 8. Given these exceptions, the contribution ban alone cannot insulate officers from having to curry political favor with superiors who might demand that they do so: although individual officers cannot contribute funds, they can provide many other resources to advance their superiors' preferred political causes. The premise of the City's justification, then, is false. Because police officers are engaged in politics, the City cannot rest on the vague and inaccurate notion of insulating them from "all political activity" to justify the Charter ban. *NTEU* demands a more concrete and credible connection between means and ends.

Philadelphia's scheme also draws an arbitrary distinction between associations of employees, who are not subject to the Charter restrictions, and individuals. As the District Court found, police officers may join groups and associations that advance their political agendas. Some of those groups, including FOP, endorse candidates for local elections and contribute to their political campaigns. FOP also holds fundraisers for these candidates, at which they hand out "courtesy cards" to large donors—practices also permitted under the regulations. These concerted acts, more than the activities of any individual officer, implicate the City's interests in ensuring the impartial enforcement of the law and in maintaining the public's perception of police integrity. But the City has not explained why it permits the police union (a group perceived to be the collective voice of the police) to engage in such expressive activities, while it precludes individual police officers (whose involvement is not

50

necessarily representative) from doing the same. The current scheme, therefore, fails to regulate a substantial part of the activity that gives rise to the alleged harms. *Cf. Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (professing "serious doubts about whether [the government] is, in fact, serving . . . the significant interests which [it] invoke[d]" where the statute was under-inclusive); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104–05 (1979) (striking down a statute that prohibited the distribution of juvenile defendants' names because the law did not regulate similar dissemination via electronic media).

Our analysis is informed by the D.C. Circuit's decision in *Sanjour v. Environmental Protection Agency*, 56 F.3d 85 (D.C. Cir. 1995), which held that an under-inclusive regulation could not survive under *NTEU* even though the government had presented a real interest. In that case, agency employees challenged a regulation that prohibited expense reimbursement from private sources only for "non-official appearances"; employees could be reimbursed if their appearance was approved by the agency. 56 F.3d at 88. The D.C. Circuit found that this dichotomy between "official" and "non-official" events undermined the agency's rationale, as the agency's interest—to curtail the "threat to the integrity of the government occasioned by employees using their public office for private gain"—was implicated whether employees' business was official or not. *Id.* at 94–95. First, an employee would receive the same private benefit "whether the agency 'approve[d]' [the reimbursement] or not"; second, officially sanctioned benefits "create[d] a greater appearance that government employment systematically translates into social advantage than would the unsanctioned perks of individual

51

bureaucrats." *Id.* at 95–96. Thus, the regulation, at least based on the agency's articulated interest, could not stand.

Likewise, here FOP's involvement in politics raises the specter of three of the City's four stated harms: ensuring that the police enforce the law without bias or favoritism; protecting subordinate employees from currying the political favor of their superiors; and maintaining the efficiency and quality, both actual and perceived, of the services provided by the police force. As the strongest proof that the "politicization of the police" remains a threat, City Br. at 51, the City pointed not to instances of individual officer misconduct, but to FOP's practice of handing out courtesy cards and its endorsement and financing of local candidates. Because the Charter ban applies only to individual officers, it serves no appreciable function in curbing these purportedly harmful practices. Furthermore, because FOP's actions are permitted, the ban impedes the strength of its lawful message by preventing COPPAC from collecting sufficient funds from willing union members. This is a strange dichotomy: allowing FOP to participate directly in partisan political campaigns, while preventing officers from contributing to a political action committee unaffiliated with any political candidate.

Regardless of whether more comprehensive restrictions on FOP and officers would be permissible—a question we need not determine here—the City's inconsistent treatment of the union and its members fatally erodes its justifications for the Charter ban. In this respect, the ban operates differently than those considered by the Fifth and Eighth Circuits. The contribution ban upheld by the Fifth Circuit in *Wachsman* was part of a larger scheme that restricted almost all of city employees' political expression, either in individual or in collective form. There, the city not

52

only prohibited its employees from contributing to campaigns, but also mandated that "[n]o employee of the city or *association of such employees* may publicly endorse or actively support candidates." 704 F.2d at 162 (quoting City Charter of the City of Dallas § 16(b)(1)) (emphasis added). Similarly, the Missouri Supreme Court's decision in *Pollard*—which was adopted in its entirety by the Eighth Circuit in *Reeder*—reasoned that the state's ban on political donations represented the legislature's determination that a contribution's "public demonstration of support" was one "a police officer should not make." *Pollard*, 665 S.W.2d at 341.

Here, the City is of two minds: Regulation 8 expressly permits a police officer to make public demonstrations of support, either through his union or on his own time, while prohibiting him from providing financial support. It is hard to fathom how the latter is a more pernicious form of expression than the former. *Cf. NTEU*, 513 U.S. at 475 (finding that "[i]mposing a greater burden on speech than on other off-duty activities assumed to pose the same threat to the efficiency of the federal service is, at best, anomalous"). And while the contribution ban may be directed generally at the problem of money in politics, that rationale cannot save the day, for the City has not relied upon it in this case. *See Sanjour*, 56 F.3d at 96 ("The *Pickering/NTEU* question . . . is not whether some conceivable 'governmental' interest might be constitutionally advanced by the regulations; . . . we must limit our inquiry to the 'interests the State itself asserts.'") (quoting *Edenfield v. Fane*, 507 U.S. 761, 768 (1993)).

Based on the foregoing, only the City's third rationale for the ban—protecting officers from politically motivated practices—has force. The City contends that officers may be subject to subtle pressures to contribute to COPPAC, and thus

53

"an officer [may] make[] a contribution based on a desire to please or avoid the displeasure of superior officers." A290–91; *see also* City Br. at 51–52. As discussed earlier, FOP intends to encourage new recruits to consent to have funds automatically deducted from their paychecks and sent to COPPAC, raising the concern that officers would be forced to donate out of professional obligation instead of personal belief. If contributing to COPPAC becomes a mark of an officer's merit, it is possible that these donations could lead to the City's concern of politically motivated hiring and advancement. *See Wachsman*, 704 F.2d at 175 (finding that the contribution ban was "reasonably necessary" to protect employees from "undue employee influence"). While the FOP Plaintiffs insist that the ban is restrictive and not protective, the City's legitimate goal of shielding employees may extend to "employees who do not wish to be protected." *Id.*

In our view, the City's concern is not so much a function of an officer's ability to make contributions; rather, it is a consequence of the *method* by which FOP seeks to extract such donations. The FOP Plaintiffs brought this suit to compel the City to implement City Bill No. 060181, a payroll deduction procedure that would enable the union (and potentially an officer's superiors, who are members of the union) to facilitate officers' recruitment as COPPAC donors. We understand why FOP would desire an automatic payroll deduction insofar as it stands to reason that its inherently coercive nature would probably maximize the amount of funds it could raise. *Cf. Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009) (recognizing that "unions face substantial difficulties in collecting funds for political speech without using payroll deductions"). But if the City truly cares

54

about insulating its police from such subtle pressures, the solution is within its power: it could repeal City Bill No. 060181. *See id.* ("The First Amendment . . . does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression."). Furthermore, the City could enforce a more direct restriction in Regulation 8, which prohibits employees from soliciting contributions at the workplace.

The Supreme Court recently stated in *McCutcheon* that a contribution restriction is not "closely drawn" if there are more targeted alternatives that would serve the government's interests. 134 S. Ct. at 1458. There, the Court considered the constitutionality of a provision in the Bipartisan Campaign Reform Act of 2002 (BCRA), which capped the total amount an individual could donate to political candidates and to political action committees.[21] *Id.* at 1442. The government argued that the aggregate cap was necessary to prevent the circumvention of contribution caps to individual candidates. *Id.* The Court found that the aggregate cap was not adequately tailored, given the existence of more targeted means to accomplish the same objective. *Id.* at 1458. It placed particular emphasis on three anticircumvention alternatives. First, it found that restrictions on transfers between candidates and political committees would more directly address Congress's concern about circumvention without the "unnecessary abridgment" of First Amendment rights. *Id.*

---

[21] BCRA imposed two separate limits on campaign contributions. Base limits restricted the amount a donor could contribute to a particular candidate or committee. Aggregate limits, in turn, restricted how much a donor could give in total to all candidates or committees. *See* 2 U.S.C. § 441a.

Second, tighter earmarking rules would accomplish the same goal. *Id.* at 1458–59. And finally, the Court found that, in the Internet age, disclosure of the identities of campaign donors provided robust protections against corruption. *Id.* at 1459–60. Likewise here, the possibility of multiple solutions for the City's stated concerns—for example, the prohibition of automatic paycheck deductions, or greater enforcement of existing anti-solicitation measures—bolster our conclusion that the Charter's ban on contributions to a political action committee is unconstitutional under the First Amendment.

In sum, the City has not demonstrated that the Charter ban as applied in this case is "closely drawn" to its interests, *Buckley*, 424 U.S. at 25, such that it addresses those interests in a "direct and material way." *NTEU*, 513 U.S. at 475. Several features of the current scheme demonstrate that the City has not met these criteria. The ban prevents police officers from donating to a political action committee unaffiliated with any political candidate, an act that the Supreme Court has stated does not implicate concerns of *quid pro quo* corruption. Nor has the City shown how the ban has any causal impact on its stated harms, and the ban is illogically under-inclusive, permitting many of the harms that the City purportedly seeks to address. These features, especially given the availability of less restrictive alternatives, compel us to invalidate the Charter ban.

\*       \*       \*

We are loath to disturb a component of the Home Rule Charter's legislative scheme, particularly in light of Philadelphia's historic struggles with police and political corruption and the Charter's centrality to the City's efforts to foster good government. The City has satisfied its burden

under *NTEU* that it has veritable interests in maintaining the integrity and impartiality of its police force, in promoting merit-based hiring and advancement, in insulating officers from political pressure, and in ensuring the efficiency and quality of police services.

But as the *NTEU* Court reiterated: "Fear of serious injury cannot alone justify suppression of free speech and assembly. . . . To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced." *NTEU*, 513 U.S. at 475 (quoting *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring)). Despite its valid concerns, the City has not explained how the Charter ban serves in a direct and material way to address these harms. Most troubling, the City claims that the ban is part and parcel of a larger scheme that insulates police officers from all politics, while simultaneously condoning political activities by the police that have similar, if not more pernicious, implications. Given the lack of fit between the City's stated objectives and the means selected to achieve it, we hold the Charter ban unconstitutional.

We will reverse the order of the District Court granting summary judgment to the City and remand the case for judgment to be entered in favor of the Appellants.